AO 106 (Rev. 04/10)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT

## for the

Eastern District of California

**FILED**

**JUL 1 8 2018**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of )<br>INFORMATION ASSOCIATED WITH )<br>MUSHEEDA@YAHOO.COM THAT IS STORED )<br>AT PREMISES CONTROLLED BY OATH )<br>HOLDINGS, INC. ) | Case No.<br><br>**2: 1 8 - SW - 5 8 9 AC** |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2421(a) | Transportation of an individual with the intent to engage in unlawful sexual conduct |
| 18 U.S.C. § 2423(a) | Transportation of a minor with the intent to engage in unlawful sexual conduct |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Greg Wenning, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/18/18

*Judge's signature*

City and state:  Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

1  McGREGOR W. SCOTT
   United States Attorney
2  NIRAV K. DESAI
   JEREMY J. KELLEY
3  Assistant United States Attorney
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone:  (916) 554-2700
5  Facsimile:  (916) 554-2900

6

7

8  Attorneys for Plaintiff
   United States of America

9
                    IN THE UNITED STATES DISTRICT COURT
10
                      EASTERN DISTRICT OF CALIFORNIA
11

12
   In the Matter of the Search of:            CASE NO.
13
   INFORMATION ASSOCIATED WITH               AFFIDAVIT IN SUPPORT OF AN APPLICATION
14 MUSHEEDA@YAHOO.COM THAT IS                 FOR A SEARCH WARRANT
   STORED AT PREMISES CONTROLLED BY
15 OATH HOLDINGS, INC.

16

17      I, Greg Wenning, being first duly sworn, hereby depose and state as follows:

18      I.      **INTRODUCTION AND AGENT BACKGROUND**

19      1.      I make this affidavit in support of an application for a search warrant for information

20 associated with a certain account that is stored at premises controlled by Oath Holdings, Inc., formerly

21 Yahoo, Inc., an email provider, which is headquartered at 22000 AOL Way, Dulles, Virginia 20166.[1]

22 The information to be searched is described in the following paragraphs and in Attachment A, hereby

23 incorporated by reference.  This affidavit is made in support of an application for a search warrant under

24 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Oath Holdings, Inc. to disclose to the

25 government copies of the information (including the content of communications) further described in

26

27      [1] A previous search warrant was obtained regarding Oath, Inc.  *See* 2:18-CR-SW-0537-CKD.
   Upon service of that warrant, I was informed that Oath, Inc., is the successor company of AOL, Inc.,
28 whereas Oath Holdings, Inc., is the successor of Yahoo, Inc.  As such, I am requesting a new warrant
   directed at Oath Holdings, Inc.

AFFIDAVIT                                          1

1  Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B

2  (hereby incorporated by reference), government-authorized persons will review that information to

3  locate the items described in Section II of Attachment B.

4       2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been

5  since February 2013.  I am currently assigned to the Sacramento Division, Stockton Resident Agency.  I

6  attended over 20 weeks of training at the FBI Academy in Quantico, Virginia, and received training in

7  areas including cybercrimes, criminal investigations, and constitutional law.  While employed by the

8  FBI, I have investigated federal criminal violations related to child exploitation and child pornography.

9  During the investigation of these cases, I have executed and participated in the execution of numerous

10  search and arrest warrants and seized evidence of violations of United States law.  I have also attended

11  training classes and seminars concerning computer crimes and the sexual exploitation of children.  I

12  have been the affiant for over twenty federal search warrants including warrants executed for and on

13  digital devices which were found to contain child pornography and other digital evidence.  Moreover, I

14  am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C.

15  §§ 2421, 2423, 2251, and 2252, and I am authorized by the Attorney General to request a search

16  warrant.

17       3.     The statements contained in this affidavit are based, in part, on:  written reports and

18  information about this and other investigations that I have received, directly or indirectly, from other law

19  enforcement officers and FBI computer forensic professionals; information gathered from the service of

20  search warrants; the results of surveillance conducted by law enforcement agents; independent

21  investigation and analysis by FBI agents/analysts; and my experience, training and background as a

22  Special Agent with the FBI.  Because this affidavit is being submitted for the limited purpose of

23  securing authorization for the requested search warrant, I have not included each and every fact known

24  to me concerning this investigation.  Instead, I have set forth only the facts that I believe are necessary to

25  establish probable cause to support the requested warrant.

26       4.     Based on the facts set forth in this affidavit, there is probable cause to believe that

27  violations of 18 U.S.C. §§ 2421(a) and 2423(a) have been committed by RODNEY FLUCAS.  There is

28  also probable cause to believe that the information described in Attachment B will constitute evidence of

1  these criminal violations.

2  ## II.  JURISDICTION

3  5.      This Court has jurisdiction to issue the requested warrant because it is "a court of

4  competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

5  (c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate judge

6  of such a court) . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. §

7  2711(3)(A)(i).

8  ## III.  PROBABLE CAUSE

9  6.      On October 25, 2017, I applied for a criminal complaint detailing evidence collected that

10  showed RODNEY FLUCAS had transported a minor, PERSON 1, from Oregon to California with the

11  intent to engage in unlawful sexual activity in or about August 2015.  A copy of the affidavit I filed in

12  support of the criminal complaint is attached here as Attachment C, and I incorporate here the facts set

13  forth therein.

14  7.      Since the complaint was filed, FLUCAS has been indicted by a grand jury.  The Third

15  Superseding Indictment contains four counts.  A copy of the Third Superseding Indictment is attached

16  here as Attachment D.  First, it charges that between on or about August 7, 2015, and on or about

17  August 17, 2015, FLUCAS transported three minors, PERSON 1, PERSON 2, and PERSON 3 in

18  interstate commerce with the intent that each engage in unlawful sexual activity in violation of 18

19  U.S.C. § 2423(a).  It also charges that in the same time period FLUCAS also transported an adult,

20  PERSON 4, with the intent that she engage in sexual activity in violation of 18 U.S.C. § 2421(a).  The

21  indictment also charges that between on or about June 16, 2015, and August 4, 2015, FLUCAS

22  transported minors PERSON 2 and PERSON 3 in interstate commerce with the intent that they engage

23  in unlawful sexual activity in violation of § 2423(a).  The indictment also alleges witness tampering in

24  violation of 18 U.S.C. § 1512(b)(2)(B).

25  8.      A jury trial was held beginning on June 1, 2018.  Following a three-week trial, the jury

26  convicted FLUCAS on the witness tampering allegation, but could not reach a verdict as to the

27  transportation counts.  The case is scheduled for a retrial of the remaining counts on September 4, 2018.

28  9.      As set forth in the attached complaint and indictment, in June 2015, PERSON 1,

1   PERSON 2, PERSON 3 (identified as MINOR 11 in the complaint) and PERSON 4 (identified as

2   PERSON 3 in the complaint) were living with FLUCAS in Klamath Falls, Oregon.  PERSON 2 and

3   PERSON 3 are FLUCAS's biological daughters and were minors.  PERSON 4 is FLUCAS's biological

4   daughter and was an adult.  PERSON 1 was a friend of PERSON 2 who had moved into the FLUCAS

5   home and was a minor.  FLUCAS was sexually abusing all four individuals.  At the time the complaint

6   was issued, PERSON 1, PERSON 2, and PERSON 4 had disclosed the abuse.  Since then PERSON 3

7   has also disclosed that she was abused by her father, FLUCAS.

8         10.     Beginning on or about June 16, 2015, FLUCAS took PERSON 1, PERSON 2, and

9   PERSON 3 on a trip to Valdosta, Georgia.  FLUCAS drove the minors from Oregon through California

10  to Reno, Nevada, where they then flew to Florida and drove to Georgia.  Since the time of the

11  complaint, I have spoken with PERSON 3's mother who has confirmed she was in the car when

12  FLUCAS drove the minors from Oregon to Nevada through California.

13        11.    While in Georgia, FLUCAS sexually abused the minors.  I have spoken with each of the

14  minors and they have confirmed FLUCAS sexually abused them in Georgia.  FLUCAS's abuse of

15  PERSON 2 was unlawful incest in violation of Georgia Code § 16-6-22.  The abuse of PERSON 3 was

16  unlawful incest in violation of Georgia Code § 16-6-22; statutory rape in violation of Georgia Code §

17  16-6-3; and child molestation in violation of Georgia Code § 16-6-22.  I know from a review of airline

18  and bank records and from speaking with the minors that FLUCAS and the minors returned to Oregon

19  on or about August 4, 2015.

20        12.     Sometime after on or about August 7, 2015, and no later than on or about August 17,

21  2015, FLUCAS then transported minors PERSON 1, PERSON 2, and PERSON 3 from Oregon to

22  Stockton, California.  FLUCAS also transported his adult daughter PERSON 4 from Oregon to

23  California at the same time.  I have spoken with each of these individuals, who have confirmed the

24  move.

25        13.    PERSON 1, PERSON 2, PERSON 3, and PERSON 4 have also disclosed to me, state

26  law enforcement officers, and child protective services employees that FLUCAS engaged in sexual

27  activity with each of them after he transported them to California.  Sexual activity with PERSON 1 was

28  unlawful intercourse with a minor in violation of California Penal Code § 261.5 and oral copulation with

1  a minor in violation of California Penal Code § 288a.  Sexual activity with PERSON 2 was unlawful

2  intercourse with a minor in violation of California Penal Code § 261.5; oral copulation with a minor in

3  violation of California Penal Code § 288a; and incest in violation of California Penal Code § 285.

4  Sexual activity with PERSON 3 was unlawful intercourse with a minor in violation of California Penal

5  Code § 261.5; oral copulation with a minor in violation of California Penal Code § 288a; and incest in

6  violation of California Penal Code § 285.  Sexual activity with PERSON 4 was unlawful incest in

7  violation of California Penal Code § 285.

8      14.    In preparation for retrial, on July 9, 2018, I spoke with a woman named Shahidah H.

9  Muhammad.  Muhammad is the grandmother of four of FLUCAS's children, whose mother has since

10  died.  Muhammad met FLUCAS when he was only sixteen years old and began a relationship with

11  Muhammad's daughter.  Because FLUCAS is now fifty years old, Muhammad has known him for

12  approximately thirty-four years.

13      15.    Over the years, Muhammad became aware of allegations that FLUCAS was sexually

14  abusing women and children.  During our conversation, Muhammad told me she has raised allegations

15  of sexual abuse against FLUCAS multiple times with various state agencies.

16      16.    I know from the statements of victims in this case that Muhammad and/or her daughter

17  Kadijah Norfleet communicated allegations of sexual abuse to the Georgia Department of Family and

18  Children Services in Valdosta, Georgia, in approximately June 2014.  After those allegations, FLUCAS

19  moved his family to Americus, Georgia.

20      17.    I know from the statements of victims in this case that in or about August 2014,

21  Muhammad communicated to the Sumter County School District allegations that FLUCAS was sexually

22  abusing children in his family.  FLUCAS was working for the school district at the time and was

23  terminated from his position after the allegations came to light.  Following these allegations, FLUCAS

24  moved the family to Klamath Falls, Oregon, where FLUCAS found employment as a teacher with the

25  Southern Oregon Education Services District (SOESD).  Muhammad did not know until later that

26  FLUCAS had moved her grandchildren from Georgia to Oregon.

27      18.    I know from a review of emails obtained from the SOESD, that on January 17, 2015,

28  Muhammad sent an email from "musheeda@yahoo.com" to the school district containing other

1   allegations that FLUCAS was "a cold and calculating psychopath with a long criminal record." After

2   these allegations, FLUCAS began to search for teaching jobs in California, and he eventually moved his

3   family to California in August 2015, following the conclusion of the school year.

4          19.     During my conversation with Muhammad, she said she had made numerous complaints

5   about FLUCAS to various state agencies, including by email using her Yahoo account

6   "musheeda@yahoo.com." However, Muhammad could not remember the exact timing of the

7   complaints or to whom specifically she had made the complaints. Muhammad told me that she had

8   more information on to whom and when she made complaints in her email account, but that she could

9   not recall the password to her account and was unsuccessful in attempting to reset the password. The

10  last time Muhammad was able to access the account was in 2017.

11         20.     In general, an email that is sent to or from a "yahoo.com" subscriber is stored on Oath

12  Holdings, Inc. servers until the subscriber deletes the email. If the subscriber does not delete the

13  message, the message can remain on Oath Holdings, Inc. servers indefinitely. Even if the subscriber

14  deletes the email, it may continue to be available on Oath Holdings, Inc. servers for a certain period of

15  time. I believe that emails stored on Oath Holdings, Inc., servers will contain evidence of allegations

16  Muhammad has made to various state agencies over the thirty-four years that she has known FLUCAS,

17  and which are relevant to establishing FLUCAS's intent when transporting his victims across the

18  country.

19                      **IV.     BACKGROUND CONCERNING EMAIL**

20         21.     In my training and experience, I have learned that Yahoo, Inc., a subdivision of Oath

21  Holdings, Inc., provides a variety of on-line services, including electronic mail ("email") access, to the

22  public. Oath Holdings, Inc. allows subscribers to obtain email accounts at the domain name

23  "yahoo.com", like the email account listed in Attachment A. Subscribers obtain an account by

24  registering with Oath Holdings, Inc.. During the registration process, Oath Holdings, Inc. asks

25  subscribers to provide basic personal information. Therefore, the computers of Oath Holdings, Inc. are

26  likely to contain stored electronic communications (including retrieved and unretrieved email for Oath

27  Holdings, Inc. subscribers) and information concerning subscribers and their use of Oath Holdings, Inc.

28  services, such as account access information, email transaction information, and account application

1    information.  In my training and experience, such information may constitute evidence of the crimes

2    under investigation because the information can be used to identify the account's user or users.

3        22.    In my training and experience, email providers generally ask their subscribers to provide

4    certain personal identifying information when registering for an email account.  Such information can

5    include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative

6    email addresses, and, for paying subscribers, means and source of payment (including any credit or bank

7    account number).  In my training and experience, such information may constitute evidence of the

8    crimes under investigation because the information can be used to identify the account's user or users.

9        23.    In my training and experience, email providers typically retain certain transactional

10   information about the creation and use of each account on their systems.  This information can include

11   the date on which the account was created, the length of service, records of log-in (i.e., session) times

12   and durations, the types of service utilized, the status of the account (including whether the account is

13   inactive or closed), the methods used to connect to the account (such as logging into the account via the

14   provider's website), and other log files that reflect usage of the account.  In addition, email providers

15   often have records of the Internet Protocol address ("IP address") used to register the account and the IP

16   addresses associated with particular logins to the account.  Because every device that connects to the

17   Internet must use an IP address, IP address information can help to identify which computers or other

18   devices were used to access the email account.

19       24.    In my training and experience, in some cases, email account users will communicate

20   directly with an email service provider about issues relating to the account, such as technical problems,

21   billing inquiries, or complaints from other users.  Email providers typically retain records about such

22   communications, including records of contacts between the user and the provider's support services, as

23   well records of any actions taken by the provider or user as a result of the communications.  In my

24   training and experience, such information may constitute evidence of the crimes under investigation

25   because the information can be used to identify the account's user or users.

26       25.    As explained herein, information stored in connection with an email account may provide

27   crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under

28   investigation, thus enabling the United States to establish and prove each element or alternatively, to

AFFIDAVIT                                                     7

1   exclude the innocent from further suspicion.  In my training and experience, the information stored in

2   connection with an email account can indicate who has used or controlled the account.  This "user

3   attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search

4   warrant at a residence.  For example, email communications, contacts lists, and images sent (and the

5   data associated with the foregoing, such as date and time) may indicate who used or controlled the

6   account at a relevant time.  Further, information maintained by the email provider can show how and

7   when the account was accessed or used.  For example, as described below, email providers typically log

8   the Internet Protocol (IP) addresses from which users access the email account along with the time and

9   date.  By determining the physical location associated with the logged IP addresses, investigators can

10  understand the chronological and geographic context of the email account access and use relating to the

11  crime under investigation. This geographic and timeline information may tend to either inculpate or

12  exculpate the account owner.  Additionally, information stored at the user's account may further indicate

13  the geographic location of the account user at a particular time (e.g., location information integrated into

14  an image or video sent via email).  Last, stored electronic data may provide relevant insight into the

15  email account owner's state of mind as it relates to the offense under investigation. For example,

16  information in the email account may indicate the owner's motive and intent to commit a crime (e.g.,

17  communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an

18  effort to conceal them from law enforcement).

19

20  //

21

22  //

23

24  //

25

26  //

27

28  //

1

## V.   CONCLUSION

2      26.     Based on the forgoing, I request that the Court issue the proposed search warrant.

3  Because the warrant will be served on Oath Holdings, Inc. who will then compile the requested records

4  at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any

5  time in the day or night.

6

7                                             Respectfully submitted,

8

9                                             Greg Wenning
                                              Special Agent
10                                            Federal Bureau of Investigation

11

12  Subscribed and sworn to before me on:   7/18/18

13

14

15  The Honorable Allison Claire
    UNITED STATES MAGISTRATE JUDGE

16

17

18

19  Approved as to form by AUSA JEREMY J. KELLEY

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with MUSHEEDA@YAHOO.COM that is stored at premises controlled by Oath Holdings, Inc., a company that accepts legal process at 22000 AOL Way, Dulles, Virginia 20166.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Oath Holdings, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

AFFIDAVIT                                                       1

## II.      Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 2421(a) and 2423(a), occurring after the creation of the email account, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

      (a) Evidence indicating to whom and when, the subscriber of the account communicated allegations of sexual, physical, and emotional abuse perpetrated by RODNEY FLUCAS;

      (b) Evidence relating to RODNEY FLUCAS's intent or state of mind when transporting his family from Valdosta, Georgia, to Americus, Georgia, to Klamath Falls, Oregon, and then to Stockton, California;

      (c) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner; and

      (d) The identity of the person(s) who created or used the user ID.

**ATTACHMENT C**

# UNITED STATES DISTRICT COURT

for the
Eastern District of California

SEALED

**FILED**

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | **OCT 25 2017** |
| | ) | |
| **RODNEY FLUCAS** | ) | Case No.   CLERK, U.S. DISTRICT COURT |
| aka Rodney Rochen Flucas, | ) | EASTERN DISTRICT OF CALIFORNIA |
| aka Rodney Rochea Flucas, | ) | BY _____ |
| aka Rodney J. Flucas | ) | DEPUTY CLERK |
| _____ | ) | |
| *Defendant(s)* | ) | **2:17-MJ - 191 ___ EFB** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   August 7, 2015 through August 17, 2015   in the county of   San Joaquin   in the

Eastern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(a) | Transportation of minor with intent to engage in criminal sexual activity |

This criminal complaint is based on these facts:

(see attachment)

☒   Continued on the attached sheet.

_____
*Complainant's signature*

Greg Wenning, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  *10-25-2017*

_____
*Judge's signature*

City and state:  *Sacramento, CA*

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

1  <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT & ARREST WARRANT</u>

2  I, Greg Wenning, being first duly sworn, hereby depose and state as follows:

3  ## I.   INTRODUCTION AND AGENT BACKGROUND

4  1.   I make this affidavit in support of an application for the issuance of a criminal complaint

5  against, and an arrest warrant for, RODNEY FLUCAS, aka Rodney Rochea Flucas, aka Rodney Rochen

6  Flucas, aka Rodney J. Flucas ("FLUCAS").  I submit that probable cause exists to believe that between

7  on or about August 7, 2015, and on or about August 17, 2015, FLUCAS transported a then-minor

8  female, whose identity is known to law enforcement and referred to herein as PERSON 1,[1] from the

9  State of Oregon to the State of California, and specifically to San Joaquin County, California, with intent

10  that PERSON 1 engage in sexual activity for which any person can be charged with a criminal offense,

11  in violation of Title 18, United States Code, Section 2423(a) ("Transportation with intent to engage in

12  criminal sexual activity").  As explained below, FLUCAS began a sexual relationship with PERSON 1

13  while living in Oregon—when PERSON 1 was approximately 15 years old and FLUCAS was

14  approximately 46 years old—impregnated PERSON 1, and transported PERSON 1 to California as a

15  minor with the intent to continue his criminal sexual contact with her.  The requested complaint for a

16  violation of § 2423(a) concerns only FLUCAS's initial transportation of PERSON 1 from Oregon to

17  California, and does not reach other potential instances where FLUCAS transported PERSON 1 over

18  state lines.

19  2.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been

20  since February 2013.  I am currently assigned to the Sacramento Division, Stockton Resident Agency.  I

21  attended over 20 weeks of training at the FBI Academy in Quantico, Virginia, and received training in

22  areas including cybercrimes, criminal investigations, and constitutional law.  While employed by the

23  FBI, I have investigated federal criminal violations related to child exploitation and child pornography.

24  During the investigation of these cases, I have executed and participated in the execution of numerous

25  search and arrest warrants and seized evidence of violations of United States law.  I have also attended

26

27  ---

[1] To protect their privacy, several adult individuals are referred to herein as "PERSON #," and minors are referred to as "MINOR #."  The identity of all of these individuals is known to law enforcement investigating this matter.

28

1   training classes and seminars concerning computer crimes and the sexual exploitation of children.  I

2   have been the affiant for over twenty federal search warrants including warrants executed for and on

3   digital devices which were found to contain child pornography and other digital evidence.  Moreover, I

4   am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C.

5   §§ 2421, 2423, 2251, and 2252, and I am authorized to seek and execute an arrest warrant.

6        3.    The statements contained in this affidavit are based, in part, on:  my personal knowledge,

7   witness interviews, written reports and information about this and other investigations that I have

8   received, directly or indirectly, from other law enforcement officers and personnel; information gathered

9   from the service of search warrants; the results of surveillance conducted by law enforcement agents;

10   independent investigation and analysis by FBI agents/analysts; and my experience, training and

11   background as a Special Agent with the FBI.  Because this affidavit is being submitted for the limited

12   purpose of seeking issuance of a criminal complaint and arrest warrant, I have not included each and

13   every fact known to me concerning this investigation.  Instead, I have set forth only the facts that I

14   believe are necessary to establish probable cause to support the requested complaint and arrest warrant.

15   **II.    RELEVANT STATUTES**

16        4.    Title 18, United States Code, Section 2423(a), entitled "Transportation with intent to

17   engage in criminal sexual activity," provides:  "A person who knowingly transports an individual who

18   has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory

19   or possession of the United States, with intent that the individual engage in prostitution, or in any sexual

20   activity for which any person can be charged with a criminal offense, shall be fined under this title and

21   imprisoned not less than 10 years or for life."

22        5.    In turn, the California Penal Code contains the following provisions, among others,

23   related to unlawful sexual activity:

24        a)    California Penal Code § 261.5 prohibits unlawful sexual intercourse with a person under

25        18, and punishes, in part:  (i) "Any person who engages in an act of unlawful sexual intercourse

26        with a minor who is more than three years younger than the perpetrator"; and (ii) "Any person 21

27        years of age or older who engages in an act of unlawful sexual intercourse with a minor who is

28        under 16 years of age."

b)     California Penal Code § 288(c), read in conjunction with California Penal Code § 288(a), punishes any person who willfully and lewdly commits any lewd or lascivious act upon or with the body, or any part or member thereof, of a child who is 14 or 15 years old, and that person is at least 10 years older than the child, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child.

c)     California Penal Code § 288A punishes, in part:  (i) "any person who participates in an act of oral copulation with another person who is under 18 years of age"; (ii) "any person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age"; and (iii) "[a]ny person who participates in an act of oral copulation with another person who is under 14 years of age and more than 10 years younger than he or she."[2]

## III.   PROBABLE CAUSE

**A.   FLUCAS is a licensed special education teacher born in 1968, and PERSON 1 was born in in 1999.**

6.     PERSON 1 is now an adult female born in 1999.

7.     FLUCAS is an adult male born in the year 1968.  FLUCAS is currently married to Evelyn Sagasi ("Sagasi"), a green card holder originally from Kenya, whom he married in 2009 and with whom he has four minor children.  According to the publicly available electronic docket for the California Superior Court for the County of San Joaquin, on or about June 5, 2017, FLUCAS petitioned for dissolution of his marriage with Sagasi in case number STA-FL-DWC-2017-0003188.

8.     FLUCAS has been in other relationships or marriages that have produced children including with:  Veronica Bell, with whom he has one child; Vanassa Flucas, with whom he has two children; Monica Muhammad (deceased), with whom he had four children; Karen Harrison (deceased), with whom he had three children; and Shirley Jackson, with whom he had two children.

9.     Based on the investigation to date, FLUCAS has resided in multiple cities throughout the United States including Harrisburg, Pennsylvania; Baltimore, Maryland; Washington, D.C.; Valdosta,

---

[2] Oregon law provides that an individual under the age of 18 is considered incapable of consenting to a sexual act, and criminalizes various sexual contacts with a person under 18.  *See* Ore. Rev. Stats. § 163.315 *et seq.*

1 | Georgia; Klamath Falls, Oregon; and Stockton, California. Based on a review of documents in this

2 | investigation, including bank records, hotel records, and employment records, FLUCAS has used an

3 | address on Jones Street in Valdosta, Georgia, as his primary mailing/home address, even while living in

4 | Oregon in 2014 and 2015, and thereafter in California since 2015. FLUCAS was observed in Stockton,

5 | California on October 13, 2017, but his residence location is presently unknown.

6 |       10.     FLUCAS is a licensed special education teacher who holds teaching licenses or

7 | credentials in the States of Georgia, Oregon, and California, as summarized below:

8 |       a)     According to the teacher license search feature of the Georgia Professional Standards

9 |      Commission's website, on May 27, 2014, FLUCAS was issued a Georgia Educator Certificate

10 |      for two special educations classifications, including for deaf education. That license has an

11 |      effective date of May 10, 2014, and an expiration date of June 30, 2019; as of October 16, 2017,

12 |      the website listed the license as active.

13 |       b)     According to the teacher license lookup application of the Oregon Teacher Standards and

14 |      Practices Commission's website, on or around September 29, 2014, FLUCAS was issued an

15 |      Initial Teaching license for special education, in the name Rodney Rochea Flucas. That license

16 |      had an effective date of September 29, 2014, and expired on March 29, 2016. FLUCAS

17 |      presently holds an active Preliminary Teaching License with two special education

18 |      classifications, including deaf and hard of hearing education at the PK through 12th grade levels.

19 |      That license has an effective date of March 30, 2016, and an expiration date of October 22, 2019;

20 |      as of October 16, 2017, the website listed the license as active.

21 |       c)     According to the teaching credential lookup feature of the California Commission on

22 |      Teacher Credentialing's website, on August 10, 2015, FLUCAS was issued an Education

23 |      Specialist Instruction Credential authorizing the teaching of deaf and hard of hearing education,

24 |      in the name Rodney Rochea Flucas. FLUCAS's credential has an expiration date of September

25 |      1, 2020, but the website reflects that on March 22, 2017, it was suspended for misconduct.

26 | **B.**    **FLUCAS moves from Georgia to Oregon to California, and is arrested on state charges.**

27

28 |       11.     According to public record databases and numerous records obtained during the

1   investigation, FLUCAS is associated with multiple addresses in Valdosta, Georgia.

2   12.   In 2014, the Georgia Division of Family and Children Services ("DFCS"), which

3   includes Child Protective Services, opened two matters involving FLUCAS: case number 17206409,

4   which appears to have been open from on or about April 4, 2014, through on or about June 19, 2014;

5   and case number 17250221, which appears to have open from on or about September 3, 2014, through

6   October 8, 2014. In summary, the cases involved allegations that FLUCAS had physically and sexually

7   abused some of his children and other minors in the home. The allegations in those matters included:

8       a)   Case number 17206409 contained an anonymous report from a member of the

9           community that PERSON 2, now an adult female born in 1998, was pregnant by her father,

10          RODNEY FLUCAS, and a report that PERSON 2's aunt, Kadijah Norfleet, had called Valdosta

11          High School and reported that she suspected PERSON 2 was impregnated by FLUCAS.

12          Norfleet also told Valdosta High School staff that PERSON 3, PERSON 2's older sister and now

13          an adult female born in 1994, was also molested by FLUCAS and that FLUCAS was the father

14          of two of PERSON 3's children. All family members were contacted by DFCS, but PERSON 2

15          and PERSON 3 denied all allegations.

16      b)   Case number 17250221 involved allegations by Shahidah Muhammad, who is Monica

17          Muhammad's mother; Monica Muhammad was married to RODNEY FLUCAS, and they had

18          four children together. Monica Muhammad passed away in October 2012 when a tree branch

19          fell on her. In short, Shahidah Muhammad alleged that FLUCAS falsified Monica Muhammad's

20          death certificate so he could obtain her death benefits; that FLUCAS violated a court order that

21          permitted Shahidah Muhammad to see her grandchildren; and that her grandchildren were being

22          sexually assaulted by FLUCAS.

23      13.   These matters were ultimately closed, in part, because the allegations were not

24  substantiated by the minors.

25      14.   According to reports of Georgia DFCS in late September 2014, in case number

26  17250221, FLUCAS called Georgia DFCS, characterized the reporting party as harassing him, told the

27  agency that his family had moved to Oregon, but would not provide his address because he was fearful

28  that the person reporting the alleged abuse might get access to the address. He told Georgia DFCS that

1 he believed the reporting party was Shahidah Muhammad, described as the children's grandmother, and
2 that Muhammad called the school where he was teaching in Americus, Georgia, in August and claimed
3 he was a rapist; he indicated the school relieved him of his duties. The report indicates FLUCAS told
4 Georgia DFCS that he would report on September 29, 2014, to his local DFCS office and make them
5 aware of Georgia DFCS's investigation.

6     15.   On May 23, 2017, I contacted the Klamath County office of the Oregon Department of
7 Human Services ("DHS"), Child Welfare department. Oregon DHS could not locate any record of
8 FLUCAS reporting his new address or prior contact with Georgia DFCS to Oregon DHS. Additionally,
9 on May 31, 2017, Oregon DHS indicated to me on a phone call that its preliminary search indicated no
10 records related to FLUCAS except those relating to self-sufficiency and public benefits.

11     16.   I have reviewed records that also indicate that FLUCAS moved from Oregon to
12 California in or around August or early September of 2015. According to records obtained from Oregon
13 DHS and dated September 4, 2015, in the context of applications for social service benefits, Sagasi
14 reported to Oregon DHS that she and her whole family had moved to 4707 Newton Falls, in Stockton,
15 California 95212. According to records obtained from Oregon DHS and dated August 27, 2015, in the
16 context of applications for social service benefits, PERSON 3 reported to Oregon DHS that she had
17 moved to Stockton, California.

18     17.   According to records obtained from the California Franchise Tax Board, FLUCAS filed a
19 "California Nonresident or Part-Year Resident Income Tax Return," on form 540NR, for the 2015 tax
20 year, with an address of 609 Jones Street, in Valdosta, Georgia. FLUCAS's Form W-2 Wage and Tax
21 Statement for the 2015 tax year, from employer Soliant Health, Inc. ("Soliant Health"), reports state
22 income for the States of Oregon and California. Based on a review of its website on June 9, 2017,
23 Soliant Health is a vendor that, in part, provides special education teachers to schools. For the 2016 tax
24 year, FLUCAS filed a "California Resident Income Tax Return," on Form 540, still listing his address as
25 609 Jones Street, in Valdosta, Georgia. FLUCAS's Form W-2 Wage and Tax Statement for the 2016
26 tax year, again from employer Soliant Health, reports state income only from the State of California.
27 According to records obtained from the California Franchise Tax Board, FLUCAS and Sagasi each
28 claimed moving expenses on their respective federal income tax returns for the 2015 tax year.

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT &amp;    6
ARREST WARRANT

18.    According to records obtained from California's Employment Development Department ("EDD"), Soliant Health reported wages for FLUCAS to the State of California from the third quarter of the year 2015, through the first quarter of the year 2017. EDD records also reflect that the Stockton Unified School District reported wages for Sagasi to the State of California from the fourth quarter of 2015, through the second quarter of 2016.[3]

19.    According to records obtained from State Farm Bank, FLUCAS's bank card ending in 4668 was used to make purchases in Lake Oswego, Oregon, and Pleasant, Oregon, on August 7, 2015. On August 8, 2015, FLUCAS's bank card was used to make purchases in Redding, California. Between August 14, 2015, and August 19, 2015, FLUCAS's bank card was used to make eight purchases in Stockton, California. State Farm Bank records also show that Sagasi's bank card ending in 6733 was used to make purchases in Klamath Falls, Oregon between August 8, 2015, and August 12, 2015. Between August 17, 2015, and August 19, 2015, Sagasi's bank card was used to make five purchases in Stockton, California. Based on these purchases, I believe that FLUCAS transported PERSON 1 from the State of Oregon to the city of Stockton, in the State of California, between August 7, 2015, and August 17, 2015. *and the information in paragraphs 26 thru 49* GW

20.    As discussed further below, on or about February 8, 2017, Stockton Police Department officers were dispatched to a hospital in San Joaquin County regarding a report of lewd and lascivious acts on a minor. PERSON 2 was at the hospital and reported that she had been molested by her father, FLUCAS, since she was 13 years old, although she described the sex as consensual. This report by PERSON 2 led to further investigation and criminal charges against FLUCAS.

21.    On February 8, 2017, FLUCAS was arrested by the Stockton Police Department at 4707 Newton Falls Lane, in Stockton, California, for alleged violations of California Penal Code § 261(A)(2), Rape by Force or Fear, and California Penal Code § 285, Incest. FLUCAS was released from custody on February 10, 2017, on $550,000 bail.

22.    On April 3, 2017, the Stockton Police Department arrested FLUCAS again. FLUCAS

---

[3] According to teacher licensing/credentialing website search applications, as of October 16, 2017, Sagasi held teaching licenses, credentials, or permits in the States of Georgia, Oregon, and California.

1  was released on $1,000,000 bail.  FLUCAS is charged in the California Superior Court, San Joaquin

2  County, in the matter of People of the State of California v. Rodney Rochen Flucas, Case No. CR-2017-

3  0001911, with:  ten counts of Unlawful Intercourse w/ Minor 3 Years Younger, California Penal Code §

4  261.5(c); four counts of Incest, California Penal Code § 285; one count of Oral Copulation of a Person

5  under 18, California Penal Code § 288A(b)(1); and two counts of Dissuading a Witness from Reporting

6  Crime, California Penal § 136.1(b)(1).

7       23.    On September 26, 2017, FLUCAS failed to appear in court.  The court issued a bench

8  warrant, but held it until September 29, 2017, at which time the court held another hearing where

9  FLUCAS appeared.

**C.   The Stockton Police Department's investigation uncovers FLUCAS's sexual contact with PERSON 1.**

24.    During the investigation into PERSON 2's statements, the Stockton Police Department

interviewed PERSON 1 and learned of, and investigated, sexual contact between FLUCAS and

PERSON 1.  The Stockton Police Department conducted two interviews with PERSON 1, and the FBI

conducted two interviews with PERSON 1 during its separate investigation.

*First Interview of PERSON 1*

25.    On February 10, 2017, detectives with the Stockton Police Department conducted an

interview with PERSON 1, and PERSON 1 provided the following information.

26.    RODNEY FLUCAS and Evelyn Sagasi became PERSON 1's legal guardians in

approximately 2014, when PERSON 1 was a sophomore in high school in Oregon.  Prior to living with

FLUCAS, PERSON 1 lived with her father, referred to herein as "Tony."  Tony worked a lot and did not

spend a lot of time with PERSON 1, so she started living with her friend, PERSON 2, and PERSON 2's

parents, FLUCAS and Sagasi.  PERSON 2 had recently moved to Oregon from Georgia, and the girls

became best friends.  PERSON 1 stated that she liked living with the Flucas family.

27.    According to PERSON 1, FLUCAS worked for the Stockton Unified School District, and

Sagasi was a stay-at-home mom.

28.    PERSON 1 said that she moved to California and lived with the FLUCAS family at their

Stockton residence, 4707 Newton Falls Lane.  The FLUCAS residence had four bedrooms.  FLUCAS

1  and Sagasi stayed in the master bedroom. PERSON 1 slept in an open area, which she described as kind

2  of like a play room, along with her son, and four other children.

3        29.     PERSON 1 confirmed to detectives that she refers to Sagasi as "Mrs. Evelyn," but calls

4  FLUCAS "daddy" because everyone calls him that. PERSON 1 described FLUCAS as smart and funny,

5  and stated that he cares about all of them and wants the best for them. She said she knows that FLUCAS

6  has helped everyone in the house, especially her, because he took her in.

7        30.     PERSON 1 has a child referred to herein as "MINOR 1," who was born in early 2016.

8  During the interview, PERSON 1 told detectives that she became pregnant while already living with

9  FLUCAS and Sagasi in Oregon. She said that the MINOR 1's father was "Marcus," who is

10  approximately 17 years old, lives in Oregon, and does not want to see the baby. PERSON 1 said she did

11  not know Marcus's last name and had known him for about six months.

12                                    *DNA Testing of PERSON 1 and MINOR 1*

13        31.     On March 3, 2017, the Stockton Police Department collected DNA samples from

14  PERSON 1 and MINOR 1, and on or about March 8, 2017, obtained a reference DNA sample from

15  FLUCAS pursuant to a search warrant.

16        32.     An April 3, 2017 report of the California Department of Justice's Bureau of Forensic

17  Services ("California DOJ") contained the results of the comparison of DNA profiles of MINOR 1 to the

18  DNA profiles of FLUCAS and PERSON 1. The report stated that the combined paternity indices mean

19  that a child with MINOR 1's profile is 180 million to 12 billion times more likely to result from a

20  mating of PERSON 1 and FLUCAS than from PERSON 1 and a random man, which provides strong

21  evidence that FLUCAS is the biological father of MINOR 1.

22                                    *Second Interview of PERSON 1*

23        33.     On March 28, 2017, detectives with the Stockton Police Department conducted a second

24  interview with PERSON 1, and PERSON 1 provided the following information.

25        34.     PERSON 1 told detectives that she had attended family court that day and told the court

26  that FLUCAS was the father of her son, MINOR 1; earlier that day a CPS social worker contacted the

27  Stockton Police Department detective and conveyed the same information.

28        35.     PERSON 1 stated that she first met FLCUAS in Oregon. PERSON 2 had taken PERSON

1   1 to the Flucas house after a football game.  During PERSON 1's sophomore year in high school,

2   September/October 2014, she began to live with the Flucas family.

3         36.     PERSON 1 stated that she was sick one time, and FLUCAS asked her to come to his

4   room where he was and asked her to lay in the bed with him.  She said they were watching a movie, and

5   FLUCAS started touching her.  FLUCAS asked her if she liked it, and PERSON 1 said yeah.  PERSON

6   1 described how her sexual activity with FLUCAS expanded to oral sex and then full intercourse

7   following this first encounter.

8         37.     PERSON 1 described her relationship with FLUCAS as consensual and that it did not

9   feel like rape at all.  The relationship with FLUCAS started when she was 15 years old, while living in

10   Oregon.  PERSON 1 found out she was pregnant with FLUCAS's child while living in Oregon, and was

11   pregnant when she moved with the Flucas family to Stockton, California.  She gave birth to her son,

12   MINOR 1, at St. Joseph's Hospital in Stockton.  PERSON 1 stated that she and FLUCAS had sex "a

13   lot," that the sex slowed to approximately once per month while she was pregnant, and increased after

14   MINOR 1 was born.  While in Stockton, PERSON 1 and FLUCAS continued to have sex, sometimes in

15   the house while others were asleep, or at a hotel.  She said the last time she and FLUCAS had sex was

16   earlier in the week he was arrested.

17         38.     PERSON 1 told detectives that FLUCAS told her to make up a name of the father of

18   MINOR 1, and to make up a story, so that nobody would find out.

19         39.     PERSON 1 again stated that her relationship with FLUCAS was "completely consensual"

20   and she did not know anything about PERSON 2 and FLUCAS having sex.

21                         *FBI Interviews with PERSON 1*

22         40.     On September 22, 2017, and again on September 29, 2017, I and another FBI Special

23   Agent interviewed PERSON 1.  PERSON 1 provided the following information.

24         41.     PERSON 1 became friends with PERSON 2 prior to moving in with the Flucas family in

25   approximately October 2014.  PERSON 1 lived in two residences with the Flucas family.  At the first

26   house on Eberlien in Klamath Falls, Oregon, PERSON 1 shared a room with PERSON 2, PERSON 3,

27   and another of FLUCAS's minor female children.  PERSON 1 lived there until approximately January

28   or February, when the FLUCAS family moved to a new house.  PERSON 1 and FLUCAS's sexual

1  relationship started at the first house, but they did not do anything sexual for a couple months before

2  they started again at the new house.

3      42.    While she was living at the new house, PERSON 1 went to the Shilo Inn in Klamath

4  Falls, Oregon, and had sex with FLUCAS. PERSON 1 recalled they had sex at the Shilo Inn on a

5  weekday and she missed school that day. She had sex with FLUCAS several more times at hotels in or

6  near Klamath Falls, while they lived in the new house.

7      43.    PERSON 1, PERSON 2, and another of FLUCAS's juvenile daughters referred to herein

8  as "MINOR 11," took a trip to Georgia with FLUCAS in June or July of 2015. PERSON 1 was

9  pregnant at the time of the trip and FLUCAS told her that he wanted her to go on the trip. MINOR 11's

10  mom, Veronica Bell, drove to Klamath Falls and picked them up and drove them back to Reno, Nevada.

11  State Farm Bank records show that FLUCAS's bank card was used to make a purchase in Reno,

12  Nevada, on June 18, 2015, and then in Valdosta, Georgia, on June 23, 2015. FLUCAS paid for the

13  tickets and they flew out of Reno to Orlando, Florida. Vanessa Flucas picked them up in Orlando and

14  drove them to Valdosta, Georgia.

15      44.    PERSON 1 stated that while in Valdosta, she had sex with FLUCAS four or five times.

16  FLUCAS would come to PERSON 1 in the middle of the night, wake her up, and take her to a lounge

17  room with a sliding door, where they would have sex on a chair.

18      45.    During the trip, FLUCAS, PERSON 1, and others traveled to Maryland, to see

19  FLUCAS's mom. They also visited Ocean City and Baltimore. State Farm Bank records show that

20  FLUCAS's bank card was used to make purchases in Baltimore and Salisbury, Maryland between July

21  14, 2017, and July 17, 2017. PERSON 1 told me that that she did not have sex with FLUCAS in

22  Maryland. They stayed in Georgia and Maryland for approximately one month total. PERSON 1 stated

23  that on the return trip they flew from Orlando to Medford, Oregon, where they were picked up and

24  driven back to Klamath Falls. State Farm Bank records show that Sagasi's bank card was used to make

25  a purchase in Medford, Oregon, on July 31, 2017.

26      46.    While in Georgia, FLUCAS told PERSON 1 that he planned to move to California

27  because a job there was offering him a lot of money. FLUCAS told PERSON 1 she should go to

28  California with him because she had his child in her stomach and he did not want to be away from his

1   child. PERSON 1 wanted to go and did not want to move back with her dad. Because PERSON 1 was

2   doing better in school, FLUCAS told Tony that it would be beneficial if PERSON 1 moved with the

3   family to California, and it would be better for PERSON 1.

4       47.     PERSON 1 told me that in approximately the second week of August 2015, the FLUCAS

5   family moved to Stockton, California. PERSON 1's brothers, referred to herein as "Joseph" and

6   "James," helped the FLUCAS family load the truck for the move. PERSON 1 rode in FLUCAS's

7   extended cab pickup truck with FLUCAS, PERSON 2, MINOR 11, and two of FLUCAS's other

8   juvenile children referred to herein as "MINOR 13" and "MINOR 14." FLUCAS drove the truck from

9   Klamath Falls, Oregon, to Stockton, California.

10      48.     Georgia Department of Motor Vehicle records show that a 2007 Chevrolet Silverado

11   truck, license plate PGF1491, is registered to FLUCAS. The vehicle registration for this truck shows

12   that the vehicle title was transferred into the name of RODNEY FLUCAS on May 26, 2007. During the

13   search warrant executed by Stockton Police Department in May 2017, this red, extended cab truck was

14   photographed outside the residence. On October 13, 2017, I observed FLUCAS driving this vehicle.

15      49.     PERSON 1 further stated that after moving to California she returned to Klamath Falls

16   with FLUCAS, Sagasi, PERSON 2, and MINOR 14, to pick up the rest of their belongings. They drove

17   a minivan to Oregon, and FLUCAS rented a truck at a U-HAUL in Medford, Oregon. PERSON 1 rode

18   in the U-HAUL truck with FLUCAS from Klamath Falls to Stockton.

19      50.     As noted above, according to records obtained from State Farm Bank, FLUCAS's bank

20   card was used to make purchases in Oregon on August 7, 2015. On August 8, 2015, FLUCAS's bank

21   card was used to make purchases in Redding, California. Between August 14, 2015, and August 19,

22   2015, FLUCAS's bank card was used to make eight purchases in Stockton, California. State Farm Bank

23   records also show that Sagasi's bank card was used to make purchases in Klamath Falls, Oregon

24   between August 8, 2015, and August 12, 2015. Between August 17, 2015, and August 19, 2015,

25   Sagasi's bank card was used to make five purchases in Stockton, California. Based on these purchases, I

26   believe that FLUCAS transported PERSON 1 from the State of Oregon to Stockton, California, between

27   on or about August 7, 2015, and on or about August 17, 2015. These purchases are consistent with the

28   statement from PERSON 1, that the initial move to California was the second week of August.

51.     PERSON 1 told me that between 2015 and 2017, PERSON 1 took multiple trips from Stockton to Klamath Falls with FLUCAS and other members of the Flucas family. While in Klamath Falls, they would stay with friends or at a hotel. PERSON 1 estimated that they took more than ten trips and she had sex with FLUCAS once every other trip. FLUCAS would come and get PERSON 1 or text and ask her come to his room or meet him in the bathroom in the hotel lobby where they would have sex. PERSON 1 told me that during a trip to Klamath Falls in November 2015, she had sex with FLUCAS in his hotel room at the Days Inn. Records from the Days Inn Klamath Falls, located at 3612 S. 6th Street, in Klamath Falls, Oregon, show a reservation by FLUCAS on November 23, 2015, for two rooms, each room with one adult and three children. This stay was charged to FLUCAS's State Farm Bank card. State Farm Bank records reflect two purchases by FLUCAS's bank card at a Days Inn, Klamath Falls, Oregon, in the amount of $68.66 each on the same date. Records from FLUCAS's State Farm Bank account and hotel records show the following trips to Oregon in this timeframe:

a)      August 2015: Records from the Days Inn Klamath Falls, located at 3612 S. 6th Street, in Klamath Falls, Oregon, show a reservation by FLUCAS on August 22, 2015, for two adults and two children in a single room.

b)      October 2015: State Farm Bank records show that FLUCAS's bank card was used to make three separate purchases of $114.24 at the Olympic Inn, in Klamath Falls, Oregon, on October 6, 2015.

c)      January 2016: Records from the Days Inn Klamath Falls, located at 3612 S. 6th Street, in Klamath Falls, Oregon, show a reservation by FLUCAS on January 2, 2016, for three adults and one child in a single room. This stay was charged to FLUCAS's Sate Farm Bank card, and State Farm Bank records reflect a charge by Days Inn, Klamath Falls, Oregon, in the amount of $68.66 on the same date.

d)      January 2017: State Farm Bank records show that FLUCAS's bank card was used to make three separate purchases of $68.99, $68.99, and $137.98 at the America's Best Value Inn, in Phoenix, Oregon, near Medford, Oregon, on January 21, 2017. An employee of America's Best Value Inn, located at 300 Pear Tree Ln., in Phoenix, Oregon, confirmed that they had records of a reservation by FLUCAS on January 20, 2017 for multiple rooms.

e)   January 2017: Records from the Cerulean Hotel, located at 100 Main St., in Klamath Falls, Oregon, show two reservations by FLUCAS for January 28, 2017, for four adults. The stay was charged to FLUCAS's State Farm Bank card. State Farm Bank records show that FLUCAS's bank card was used to make a purchase at the Cerulean Hotel, Klamath Falls, Oregon, in the amount of $75.87 on January 29, 2017.

52.   In the Fall of 2015, while PERSON 1 was living in California, FLUCAS bought her an LG Escape 2 smartphone, after FLUCAS saw her school progress report. The phone was assigned phone number (229) 251-0184, and records from AT&T confirm that this number was associated with an LG Escape 2 device. This phone was not recovered by Stockton Police Department during their search of 4707 Newton Falls Lane, in Stockton, California. According to PERSON 1, FLUCAS added the cell phone to his family plan. PERSON 1 used the phone to text and call FLUCAS, which was confirmed by toll records from AT&T. FLUCAS would text and ask PERSON 1 for nude photos. FLUCAS would also text to see if she was awake and tell her to meet him for sex when they lived at the house in Stockton, California. He would also wake PERSON 1 up in the middle of the night and have sex with her. FLUCAS used a black iPhone 6 Plus with phone number (229) 444-7367. This was FLUCAS's personal phone. This phone was not recovered by Stockton Police Department during their search of 4707 Newton Falls Lane, in Stockton, California. FLUCAS also used a Galaxy Note 4 with phone number (541) 591-8329, which was his work phone. This phone was not recovered by Stockton Police Department during their search of 4707 Newton Falls Lane, in Stockton, California. PERSON 1 told me that sometime between Christmas 2016 and when FLUCAS was arrested in February 2017, PERSON 1 left her LG cell phone, with phone number (229) 251-0184, at a hotel when she was returning from Klamath Falls with FLUCAS. PERSON 1 believed the hotel located the phone, and FLUCAS said they found it and were going to mail it back, but PERSON 1 never used the phone after she left it at the hotel and did not know if the hotel ever sent it to FLUCAS.

53.   According to PERSON 1, she first told her father, Tony, she was pregnant in October 2015. After PERSON 1 told Tony she was pregnant, Tony called FLUCAS, and PERSON 1 was also on the phone. FLUCAS asked PERSON 1 to make it seem like she had lied to FLUCAS and had not told anyone including FLUCAS that she was pregnant. FLUCAS told PERSON 1 to pretend that if

1   FLUCAS had known about the pregnancy, he would have kicked her out of the house. When PERSON

2   1 told Tony, FLUCAS acted like he was just finding out and told PERSON 1 that he would not have

3   kicked her out. FLUCAS actually learned that PERSON 1 was pregnant when PERSON 1 told

4   FLUCAS that she had not gotten her period around her birthday in 2015. On her birthday in June 2015,

5   PERSON 1, FLUCAS and PERSON 2, went to the Dollar Tree and purchased some pregnancy tests.

6   State Farm Bank records show that FLUCAS's bank card was used to make a $16.00 purchase at the

7   Dollar Tree in Klamath Falls on June 13, 2015.

8       54.     PERSON 1 told me that FLUCAS asked PERSON 1 to make up a name for the father of

9   MINOR 1. PERSON 1 lied and told Tony that the father was "Marcus," who she did not know very

10  well. Tony was upset because PERSON 1 had lied to him about being pregnant and Tony said he was

11  trying to find Marcus. PERSON 1 told me she felt like she was forced to lie to Tony because she needed

12  to protect FLUCAS, and she knows now that it was not right. FLUCAS told Tony something like "girls

13  get pregnant, sometimes it just kinda happens," and that he had past experience because it happened

14  with his daughter, PERSON 3, and his step-daughter, referred to herein as "PERSON 4."

15      55.     Tony wanted PERSON 1 to move back to Klamath or to Los Angeles to live with

16  PERSON 1's step-mom and not be a burden on the FLUCAS family, but FLUCAS convinced Tony to

17  let PERSON 1 stay. FLUCAS told PERSON 1 that if Tony sent her to live with her step-mom,

18  FLUCAS would immediately buy her a bus ticket and "have her sent back to where he was" to be with

19  him. PERSON 1 also told me that she felt like she had to be there with FLUCAS because it was

20  benefitting her son to be there.

21      56.     PERSON 1 told me that FLUCAS bought her various gifts including lots of clothing

22  because she did not have much, as well as lots of "Star Wars stuff." FLUCAS also purchased a

23  Samsung Galaxy tablet for her before the first time they had sex. A Samsung Galaxy tablet with

24  evidence that it had been used by PERSON 1, was recovered from FLUCAS's residence in Stockton,

25  California during the execution of the state search warrant. PERSON 1 also stated that around October

26  2014, FLUCAS used a credit card and bought her a short blue homecoming dress from a Ross store in

27  Klamath Falls; PERSON 2 also previously told Stockton Police Department detectives that FLUCAS

28  had bought PERSON 1 a homecoming dress. Records from State Farm Bank show that FLUCAS's

1  bank card was used to make a purchase at Ross Store #817, in Klamath Falls, Oregon in the amount of

2  $115.90 on October 11, 2014. PERSON 1 stated that she sent photos of herself in the dress to FLUCAS

3  and to PERSON 2. PERSON 1 also told me that FLUCAS bought her a giant teddy bear, which she

4  described as a nine-foot bear she kept by her bed; she no longer has the bear. PERSON 1 further stated

5  that FLUCAS had purchased her a Coach brand purse for her birthday in 2015, which she showed to me

6  during my September 22, 2017, interview. State Farm Bank records show that FLUCAS's bank card

7  was used to make a purchase at a Coach store in Bend, Oregon, on June 7, 2015, for $677.19. This was

8  only days after PERSON 1's birthday. FLUCAS also bought clothes and other baby items for

9  MINOR 1.

10      57.     PERSON 1 told me that she and FLUCAS would have sex at hotels or motels in and

11  around Stockton near the high school she attended. PERSON 1 looked at a map that contained two

12  hotels and identified the Clarion Hotel in Stockton as a hotel where she may have had sex with

13  FLUCAS.

14      58.     PERSON 1 told me that FLUCAS asked her to take photographs and videos of herself

15  and send them to FLUCAS's iPhone 6 Plus. She said that FLUCAS texted her asking her to take

16  pictures of herself completely nude and touching herself in the photos, and that she did. She said that on

17  two separate occasions, that she remembered, she sent FLUCAS maybe ten photos each time. PERSON

18  1 also stated that FLUCAS asked her to send him videos of her touching herself with her fingers, and

19  that she sent maybe two such videos to FLUCAS using her LG phone, which FLUCAS purchased for

20  her in California in 2015.

21              *First Interview with PERSON 1's Father, "Tony"*

22      59.     On February 28, 2017, the Stockton Police Department interviewed Tony, who provided

23  the following information.

24      60.     Tony met FLUCAS when the Flucas family lived in Klamath Falls, Oregon. PERSON 1

25  became friends with PERSON 2 and told Tony that FLUCAS worked for the school district and worked

26  with handicapped kids. Eventually, PERSON 1 asked Tony if she could stay with the Flucas family.

27  Tony spoke with FLUCAS and ended up agreeing to let PERSON 1 stay with the Flucas family, in part,

28  because PERSON 1's grades had improved while spending time with the family. PERSON 1 moved in

1 | with the Flucas family around the end of 2014.

2      61.     While PERSON 1 was living with the Flucas family, FLUCAS called Tony and told him

3 | that he had a received a job offer in Stockton, CA. Tony told FLUCAS that PERSON 1 could come

4 | back to live with him in Oregon, but PERSON 1 asked if she could move to Stockton with the Flucas

5 | family, and Tony agreed. PERSON 1 and the Flucas family moved to Stockton in the summer of 2015.

6      62.     In October 2015, Tony spoke to PERSON 1 on the phone, and she told him she was

7 | pregnant. PERSON 1 conceived the baby in Oregon while she was living with the Flucas family, and

8 | was not living with Tony when she was pregnant. Tony called FLUCAS and told him that he was going

9 | to have PERSON 1 come back home to Klamath Falls, but PERSON 1 did not want to go back to

10 | Oregon. Tony discussed the situation with FLUCAS and Sagasi, and ultimately decided to let PERSON

11 | 1 stay in Stockton. Looking back, Tony felt like he made a terrible mistake by allowing his daughter to

12 | live with the Flucas family.

13                                  *FBI Interview with Tony*

14      63.     On September 20, 2017, I interviewed Tony, and he provided the following information.[4]

15      64.     At the time his daughter got involved with the Flucas family, he was living outside

16 | Klamath Falls, Oregon, and PERSON 1 was living with Tony's older sons in Klamath Falls.

17      65.     Tony stated that prior to her involvement with the Flucas family, PERSON 1 struggled in

18 | school. Tony stated that his daughter began spending time with PERSON 2, and that PERSON 2

19 | seemed like a good influence as a straight-A student playing in the band. PERSON 1 and PERSON 2

20 | began spending a lot of time together, and eventually PERSON 1 asked Tony if she could live with the

21 | Flucas family. Tony allowed it because his daughter's grades had improved. He further stated that he

22 | believed that the Flucas household seemed to provide a structured life, with rules like no tablets, no

23 | television, and no internet during the week, and required chores and church on Sunday.

24      66.     Tony spoke to FLUCAS weekly about teenage stuff, church, and the Bible, and stated

25 | that he spoke to FLCUAS as if he were a brother. Tony described FLUCAS as working for the school

26 | district, working with disabled children, and as a deacon of the church. FLUCAS told Tony that he was

27

28 |      [4] On September 18, 2017, I spoke to Tony on the phone, but the substance of that phone call is not directly relevant to the issuance of the requested complaint and arrest warrant.

1  living in Atlanta and was recruited by the Klamath Falls School District and had been made an offer he

2  could not refuse.

3      67.    Eventually, PERSON 1 called Tony and asked if she could go to Stockton with the Flucas

4  family. Tony spoke to FLUCAS and Sagasi about the move over the phone and in person, and FLUCAS

5  again stated that he was being recruited and was given an offer he could not refuse. FLUCAS raised the

6  idea that he was worried PERSON 1 would regress. Tony said that PERSON 1 could come home, but

7  ultimately agreed to the move because he did not want his daughter to regress and because the distance

8  to Klamath Falls, Oregon, and Stockton, California, was about the same relative to where he was living.

9      68.    In terms of gifts, Tony recalled that on one occasion, FLUCAS called him and said he

10  had found some Coach type purse for half-price and asked if he could buy one for PERSON 1.

11  FLUCAS told Tony he was also buying one for Sagasi and for PERSON 2.

12      69.    Consistent with PERSON 1's statement, Tony stated that in the summer of 2015,

13  FLUCAS took PERSON 1 and PERSON 2 on a one-month vacation to visit PERSON 2's mother,

14  Vanassa, in Valdosta, Georgia, and to go to Disney World. FLUCAS paid for PERSON 1's ticket.

15  FLUCAS told Tony that the girls would be staying with PERSON 2's mother, and provided her phone

16  number, but that FLUCAS would be traveling to Maryland, too, to work on some houses.

17      70.    Tony stated that the Flucas family and PERSON 1 moved to Stockton in late August or

18  early September of 2015, after the trip to Georgia. Tony offered FLUCAS the assistance of his two

19  older sons for the move. His sons helped with the move. Although he did not witness the move, Tony

20  said that the Flucas family had a red pickup truck, a van, and an SUV.

21      71.    Tony said that while PERSON 1 was in Oregon, and again after the move to California,

22  he signed a document that was power of attorney, provided by FLUCAS, that gave FLUCAS and Sagasi

23  rights with respect to PERSON 1's medical care and authority to attend PERSON 1's Individual

24  Education Plan meetings with the school district that related to math learning challenges. Tony faxed

25  this power of attorney to a school in Klamath Falls and also to a school in Stockton at FLUCAS's

26  request. On October 4, 2017, Tony provided the FBI a copy of the power of attorney that he signed.

27  The power of attorney shows that it was originally faxed from "Rodney Flucas" to Tony on August 31,

28  2015. It was then signed by Tony on August 31, 2015, and was faxed to Attn: L.A. (209) 464-4708 and

1   Attn: Robert Flucas, (229) 516-1081.

2       72.    In late October 2015, PERSON 1 called Tony and told her she was pregnant and had

3   missed her period in April. Tony said he had to pry it out of her, but PERSON 1 told him that the father

4   was a boy named "Marcus" in Klamath Falls and that she did not know his last name. Although Tony

5   said that PERSON 1 was more than welcome to come home, PERSON 1 was adamant about not going

6   back to Klamath Falls.

7       73.    Tony also spoke to FLUCAS about the pregnancy. FLUCAS told Tony that he felt bad

8   that PESON 1 had gotten pregnant, and that the father was some guy named Marcus in Klamath. Tony

9   said he was up in Klamath Falls looking for the father, and FLUCAS told Tony that he was looking for

10   the kid, too.

11       74.    Tony believed that while on the phone with FLUCAS and PERSON 1, he was told that

12   his daughter got pregnant when, one day, she did not go to school and got a note signed by one of

13   Tony's sons, went to her own family's house, left the basement door open, and then had sex with a boy

14   who had come over.

15       75.    Shortly after MINOR 1 was born, Tony was in Stockton and he and FLUCAS went

16   shopping for baby supplies together. FLUCAS offered to either buy a stroller or pay for half of a stroller

17   for the baby. FLUCAS ended up contributing money to purchase at least one item for MINOR 1.

18       76.    Tony indicated that he had communicated with his daughter at a number with Georgia

19   area code (229), but could not recall the complete number. However, he had not contacted her on that

20   number since around the time FLUCAS was arrested. FLUCAS told Tony that PERSON 1 had left her

21   phone at a hotel, but that the hotel was going to mail the phone to PERSON 1; he speculated that his

22   daughter never got the phone back. One to two days later, Child Protective Services called Tony about

23   his daughter.

24       **D.**    **DNA testing provides strong evidence that FLUCAS also fathered children with his**

25   **daughter, PERSON 3, and his stepdaughter, PERSON 4.**

26       77.    In addition to the DNA testing performed relative to MINOR 1, the California DOJ also

27   performed DNA testing with respect to three children born to PERSON 3, and six children born to

28   FLUCAS's stepdaughter, referred to here as PERSON 4.

78.     PERSON 3 is FLUCAS's daughter, who was born in 1994.  PERSON 3 gave birth to three children.  On February 10, 2017, the Stockton Police Department collected DNA samples from PERSON 3's children, referred to here as MINOR 2, MINOR 3, and MINOR 4.  An April 3, 2017 report of the California DOJ contained the results of the comparison of DNA profiles of MINORS 2, 3, and 4, respectively, to the DNA profiles of FLUCAS and PERSON 3, and stated, in part:

a)      As to MINOR 2, the combined paternity indices mean that a child with MINOR 2's profile is 210 million to 25 billion times more likely to result from a mating of PERSON 3 and FLUCAS than from PERSON 3 and a random man, which provides strong evidence that FLUCAS is the biological father of MINOR 2.

b)      As to MINOR 3, the combined paternity indices mean that a child with MINOR 3's profile is 2 million to 14 million times more likely to result from a mating of PERSON 3 and FLUCAS than from PERSON 3 and a random man, which provides strong evidence that FLUCAS is the biological father of MINOR 3.

c)      As to MINOR 4, the combined paternity indices mean that a child with MINOR 4's profile is 4.9 million to 1.4 billion times more likely to result from a mating of PERSON 3 and FLUCAS than from PERSON 3 and a random man, which provides strong evidence that FLUCAS is the biological father of MINOR 4.

79.     PERSON 4 is FLUCAS's stepdaughter, who was born in 1992, and is not a blood relative of FLUCAS.  PERSON 4 gave birth to six children.  On or about April 13, 2017, the Stockton Police Department collected DNA samples from PERSON 4 and five of PERSON 4's children, referred to here as MINOR 5, MINOR 6, MINOR 7, MINOR 8, and MINOR 9.  On or about June 27, 2017, the Stockton Police Department collected a DNA samples from PERSON 4's sixth child, MINOR 10.  California DOJ reports dated June 21, 2017, and September 7, 2017, contain the results of the comparison of DNA profiles of MINORS 5, 6, 7, 8, 9, and 10, respectively, to the DNA profiles of FLUCAS and PERSON 4, and stated, in part:

a)      As to MINOR 5, the combined paternity indices mean that a child with MINOR 5's profile is 2.5 billion to 290 billion times more likely to result from a mating of PERSON 4 and FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

1    FLUCAS is the biological father of MINOR 5.

2        b)     As to MINOR 6, the combined paternity indices mean that a child with MINOR 6's

3    profile is 240 million to 18 billion times more likely to result from a mating of PERSON 4 and

4    FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

5    FLUCAS is the biological father of MINOR 6.

6        c)     As to MINOR 7, the combined paternity indices mean that a child with MINOR 7's

7    profile is 110 million to 66 billion times more likely to result from a mating of PERSON 4 and

8    FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

9    FLUCAS is the biological father of MINOR 7.

10       d)     As to MINOR 8, the combined paternity indices mean that a child with MINOR 8's

11   profile is 440 million to 380 billion times more likely to result from a mating of PERSON 4 and

12   FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

13   FLUCAS is the biological father of MINOR 8.

14       e)     As to MINOR 9, the combined paternity indices mean that a child with MINOR 9's

15   profile is 57 million to 15 billion times more likely to result from a mating of PERSON 4 and

16   FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

17   FLUCAS is the biological father of MINOR 9.

18       f)     As to MINOR 10, the combined paternity indices mean that a child with MINOR 10's

19   profile is 1.5 billion to 320 billion times more likely to result from a mating of PERSON 4 and

20   FLUCAS than from PERSON 4 and a random man, which provides strong evidence that

21   FLUCAS is the biological father of MINOR 10.

22   **E.**    **Interviews by the Stockton Police Department produce statements of sexual contact**
     **between FLUCAS and his daughters and stepdaughter.**
23

24   *Initial Statements by PERSON 2*

25       80.    As noted above, the Stockton Police Department began investigating FLUCAS as a result

26   of allegations made by PERSON 2 on or about February 8, 2017. On February 8, 2017, PERSON 2,

27   now an adult female born in 1998, was in a car accident and taken to a hospital in San Joaquin County.

28   While at the hospital, PERSON 2 told officers from the Stockton Police Department that she left her

    21

1   house the previous night, February 7, 2017, after becoming upset that her father, RODNEY FLUCAS,

2   forced her to have sex with him at their home in Stockton, California. The following is taken from

3   reports of PERSON 2's statements to the Stockton Police Department on February 8, 2017, and April 3,

4   2017.

5        81.    On February 7, 2017, PERSON 2 had asked to go to a basketball game and a college fair

6   in Oakland, and FLUCAS said he would think about it. FLUCAS told PERSON 2 to lock the door and

7   asked, "Which one do you really want to go to?" FLUCAS then told PERSON 2, to take off her pants

8   and he put Vaseline in her vagina while she was leaning over the bed and FLUCAS was standing behind

9   her. FLUCAS put his penis into her vagina. PERSON 2 started crying and told FLUCAS it hurt so he

10  would stop, and FLUCAS stopped. PERSON 2 left the house and went on a drive to clear her head, and

11  that is when she blacked out and woke up in the hospital.

12       82.    PERSON 2 told officers that she was first molested by her father, FLUCAS, when she

13  was 13 years old, while living in Valdosta, Georgia. PERSON 2 did not characterize it as rape and told

14  officers, "I consented to everything. I was just confused." She further stated, "He started showing me

15  things, like teaching me how to have an orgasm. It started with toys and eventually, when I got to the

16  age of 13, I lost my virginity to my dad." FLUCAS showed PERSON 2 how to use a vibrator then

17  began to insert his penis into her vagina. PERSON 2 became pregnant with FLUCAS's child when she

18  was 14 or 15 years old, while they lived in Valdosta, Georgia. After PERSON 2 was approximately five

19  to six months pregnant, she gave birth to a baby that died during childbirth. PERSON 2 then moved

20  with FLUCAS to Americus, Georgia, in 2014. FLUCAS was fired from his job at a school in Americus

21  after the Mohammads[5] accused FLUCAS of being a rapist. I know from the investigation that FLUCAS

22  was previously married to Monica Mohammad, who is deceased, and that in 2014, Monica

23  Mohammad's sister and mother contacted Georgia DFCS about possible sexual abuse involving

24  FLUCAS's children. According to PERSON 2, FLUCAS then got a job in Oregon, and PERSON 2

25  moved to Klamath, Oregon, with FLUCAS in September 2014.

26

27        [5] In various reports I have reviewed, the names "Muhammad" and "Mohammad" have been
used. Based on the investigation and context in which the names have been used, I believe these
28  different spellings to be referring to the same family name.

83.     PERSON 2 estimated that from 2013 to 2015, FLUCAS had sex with her 20 times, and that after moving to Oregon, FLUCAS began to have sex with her more. In 2015, while living in Oregon, FLUCAS would "show her stuff" and it would always end with FLUCAS inserting his penis into her vagina. After they moved to Oregon, FLUCAS had sex with PERSON 2 approximately ten times.

84.     PERSON 2 moved with FLUCAS to Stockton, California, in August 2015. Since moving to Stockton, PERSON 2 estimated that she had sex with FLUCAS over 20 times. PERSON 2 told her boyfriend, Steven Turner ("Turner"), that her father was molesting her. Turner wanted PERSON 2 to tell someone what her father had been doing to her. FLUCAS continued have sex with PERSON 2, and when she would ask her father for something or to go out, FLUCAS would ask her, "What are you going to do for me?" PERSON 2 would be forced to have sexual intercourse with her father. PERSON 2 explained sexual intercourse as "A penis inserted into my vagina." Eventually, PERSON 2 stopped asking her father for things because she knew it "came at a price."

85.     PERSON 2 also had sex with FLUCAS at locations outside of the Stockton residence. On one occasion, FLUCAS purchased alcohol for PERSON 2 and drove her to a hotel in Stockton, where they had sex. On another occasion, PERSON 2 and FLUCAS drove to Oregon to get FLUCAS's car serviced. On the way, they stopped at a hotel. PERSON 2 stated that she hated when he stopped because FLUCAS would only get one hotel room with one bed.

86.     While living in Oregon, PERSON 2 met and became friends with PERSON 1, during her sophomore year of high school. PERSON 2 reported that during that year, FLUCAS bought a dress for PERSON 1 for homecoming, and PERSON 1 started regularly spending the night with the Flucas family. PERSON 1 became pregnant in the beginning of 2015, and later told PERSON 2 that she was having sex with FLUCAS. PERSON 2 thought that FLUCAS may also be the father of PERSON 1's child, MINOR 1.

87.     PERSON 2 stated that her sister, a juvenile female known to law enforcement personnel and referred to here as MINOR 11, who was born in 2001 and is a daughter of FLUCAS, told PERSON 2 that FLUCAS was also having sex with her. According to PERSON 2, MINOR 11 told her that it started when she was six years old. MINOR 11 also told PERSON 2 she had a pregnancy scare while

1 living in Stockton, which FLUCAS tried to cover up.

2     88.      PERSON 2 also told detectives that her older sister, an adult female daughter of

3 FLUCAS's born in 1997, who known to law enforcement and referred to here as PERSON 5, also told

4 her that FLUCAS was having sex with PERSON 5 in Georgia.

5                           *Interview of Steven Turner*

6     89.      Steven Turner was interviewed by the Stockton Police Department and provided the

7 following information. Turner was PERSON 2's boyfriend. In January 2017, PERSON 2 told Turner

8 that her father, RODNEY FLUCAS, had been raping her since she was 13 years old. FLUCAS started

9 molesting her by using toys and then progressed to having sexual intercourse with PERSON 2.

10                           *Interview of Rich Shepherd*

11     90.      On February 8, 2017, Rich Shepherd ("Shepherd") was interviewed by the Stockton

12 Police Department and provided the following information. Shepherd is a teacher at Franklin High

13 School, and PERSON 2 was a student of his a year-and-a-half prior to the interview. PERSON 2 started

14 to tell Shepherd "delicate stuff" and told Shepherd about her pregnancy and that FLUCAS would

15 verbally abuse her. Shepherd learned from another student, Steve Turner, that PERSON 2 was being

16 physically abused at her home. Shepherd notified Child Protective Services ("CPS") but was not sure

17 what exactly was going on until he got to the hospital and spoke with PERSON 2 after her accident. At

18 the hospital, PERSON 2 told Shepherd she would have to have sex with FLUCAS to get things she

19 wanted.

20                           *Interview of Shirley Jackson*

21     91.      On March 16, 2017, Shirley Jackson ("Jackson"), spoke with the Stockton Police

22 Department and provided the following information.

23     92.      Jackson is the mother of PERSON 3, one of FLUCAS's daughters born in 1994. Jackson

24 met FLUCAS in 1993, in Harrisburg, Pennsylvania, but left FLUCAS when she was pregnant with her

25 second child, Rodney Flucas, Jr. (hereinafter, "Rodney Jr."), after she found out that FLUCAS had

26 another life and other children with a woman named Karen Harrison.

27     93.      When PERSON 3 and Rodney Jr. were young, they went to live with FLUCAS in

28 Georgia. Rodney Jr. returned to live with Jackson, but PERSON 3 stayed with FLUCAS in Georgia.

1  After PERSON 3 became pregnant with her second child, Jackson started to question who was the father

2  of PERSON 3's children.  FLUCAS kept PERSON 3 away from Jackson because of her questions.

3  PERSON 3 became pregnant with her second child within four months of moving to Oregon from

4  Georgia.  PERSON 3 was pregnant a total of four times.  She had three children and had an abortion

5  between her first and second child.  Jackson asked PERSON 3 if FLUCAS was the father of her

6  children.  PERSON 3 initially denied it, but then said it was possible and that she "Turkey Basted it."

7  *First Interview of PERSON 3*

8       94.     On February 10, 2017, PERSON 3 was interviewed by Stockton Police Department and

9  provided the following information.

10      95.     PERSON 3 was born in Pennsylvania and moved to Georgia to live with FLUCAS in

11  2008, when she was 13 years old.  PERSON 3 moved with FLUCAS from Georgia to Oregon in 2014,

12  then from Oregon to California in August of 2015.  When FLUCAS decided to move to California,

13  PERSON 3 moved with him because she did not want to live alone in Oregon.

14      96.     PERSON 2 told PERSON 3 that she (PERSON 2) lost her virginity at age 13.  PERSON

15  3 stated that PERSON 2 started to be home schooled and began dating a boy named Kevin, who

16  PERSON 2 said got her pregnant.  PERSON 2's baby was born premature and died on April 1, 2014.

17  PERSON 2 never told PERSON 3 anything about FLUCAS sexually assaulting PERSON 2 or anyone

18  else in the house.

19      97.     After PERSON 2 reported being molested by FLUCAS, CPS spoke to everyone at the

20  house.  PERSON 3 advised CPS that when they are disciplined, FLUCAS will have a talk with them

21  upstairs in his bedroom.  Sometimes they will be in the room alone and sometimes they will all have to

22  go in the room, mentioning PERSON 1, PERSON 2, herself, PERSON 4, MINOR 11, and MINOR 12, a

23  juvenile female born in 1999 who is also one of FLUCAS's daughters.  FLUCAS will ask his wife to

24  step out of the room if one of the kids needs to vent or have a conversation.  The bedroom is FLUCAS's

25  private area.

26      98.     During this interview, PERSON 3 told the Stockton Police Department that she had a

27  great relationship with FLUCAS, he was a great man to her and treated her well, she has not seen

28  FLUCAS treat anyone badly in the home, and she did not believe PERSON 2 in regards to the

1  allegations of possible sexual abuse.

2  *Second Interview of PERSON 3*

3      99.     During an April 5, 2017 follow-up interview conducted after the DNA results had been
4  received, PERSON 3 spoke with the Stockton Police Department, with her attorney present, and
5  provided the following information.

6      100.    PERSON 3 told detectives that the DNA test would show that FLUCAS is the father of
7  her children. PERSON 3 initially claimed that she used a syringe to "inseminate" herself with
8  FLUCAS's sperm, which she obtained from FLUCAS's used condoms she took from a trash can in
9  FLUCAS's bedroom. PERSON 3 first found out she was pregnant around May 30, 2010. FLUCAS
10  knew that PERSON 3 was pregnant so PERSON 3 told him it was by a boy named Brian Walker.
11  PERSON 3 was pregnant four times and got an abortion on July 13, 2012. She further stated that she
12  never had sex with her father and that he never touched her.

13      101.    After detectives explained to PERSON 3 that the process she described for inseminating
14  herself was not scientifically possible, she admitted that the story was made up. PERSON 3 told them,
15  "I don't want this to get out to him though." In part, she was afraid that if she said something to police,
16  something bad was going to happen to her. She told the detectives that on February 14, 2017, FLUCAS
17  came to her school and told her to tell police the story about inseminating herself with the syringe.
18  PERSON 3 stated that her dad told her he was going to give police recordings of her having sex with
19  him if she said anything, and that she would be arrested and go to jail for nine years. PERSON 3 said
20  there were too many such recordings to count because "I was always asked to have sex with him all the
21  time." PERSON 3 stated that FLUCAS used his phone or computer to record them, that she had seen
22  some of the videos in the past, but that she did not know what computer or cell phone the recordings
23  were saved to. The last time PERSON 3 and FLUCAS had sex was the last week of March 2017, and
24  FLUCAS recorded it. FLUCAS told PERSON 3 that he had sex with her and recorded it to make sure
25  "they were on the same page." They had sex in a trailer that FLUCAS had purchased.

26      102.    PERSON 3 told detectives that while in Georgia, she had sex with FLUCAS multiple
27  times and in multiple locations, starting at age 15. When PERSON 3 was pregnant with her first child,
28  she tried to tell everyone what was going on, but FLUCAS covered it up. PERSON 3 kept a journal of

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT &      26
ARREST WARRANT

1  everything; however, FLUCAS found the journal and burned it. PERSON 3 stated that she and
2  FLUCAS continued to have sex, in multiple rooms of the homes they lived in, after they moved from
3  Georgia to Oregon. When PERSON 3 moved to Stockton, California, with FLUCAS, they continued to
4  have sex, in the garage, the living room, FLUCAS's bedroom and bedroom closet. FLUCAS's threats to
5  give police recordings of PERSON 3 having sex with FLUCAS kept PERSON 3 from telling the
6  Stockton Police Department the truth initially, because she did not want to go to prison. PERSON 3 told
7  detectives that all three of her children were fathered by FLUCAS.

8      103.    PERSON 3 told the Stockton Police Detectives that her sister, MINOR 11, told her that
9  FLUCAS began having sex with MINOR 11 when MINOR 11 was ten years old. PERSON 1 also
10  confirmed to PERSON 3 that she had been having sex with FLUCAS.

11                              *Interview of PERSON 5*

12      104.    On or about April 3, 2017, FLUCAS's adult daughter identified above as PERSON 5,
13  born in 1997, was interviewed by the Stockton Police Department and provided the following
14  information.

15      105.    PERSON 5 had been molested by her father, RODNEY FLUCAS, for about six years.
16  PERSON 5 advised that at age 11, she and her half-brother began to have sex with each other. FLUCAS
17  caught PERSON 5 and her half-brother the day before Mother's Day, when PERSON 5 was 12 years
18  old. PERSON 5 advised she does not think things with FLUCAS would have started had he not found
19  out about her and her half-brother.

20      106.    When PERSON 5 was 12 years old, while living in Georgia, FLUCAS began to teach her
21  about sex, teaching her how sex should feel and how to use sex toys, and then it resulted in having
22  intercourse. FLUCAS showed PERSON 5 how to use a vibrator and asked her to show him how open
23  she was, meaning her vagina. FLUCAS also took a picture of PERSON 5's vagina once to show her
24  how open she was; he took the photograph with a cell phone and then deleted the picture. PERSON 5
25  estimated that FLUCAS had sex with her multiple times between the ages of 12 and 15, and more than
26  50 times total. PERSON 5 was 12 years old when FLUCAS started to have sex with her, and she was
27  approximately 15 or 16 years old when FLUCAS moved to Oregon.

28      107.    PERSON 5 also stated, "I really didn't have a say in the matter, because when it

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT &        27
ARREST WARRANT

1  ultimately boils down, he was my father, and you know, I always thought that he was looking out for me

2  and my common interests, but always after we encountered sexual activities I always feel, I don't know

3  I would feel, dirty and sick." PERSON 5 felt that if she told her family what was happening, "He could

4  just deny it and blame on Oh, this girl is depressed. She doesn't know what she's talking about. She's

5  lying for attention. All that other stuff, so he was trying to cover up his tracks I wouldn't talk."

6      108.    PERSON 5 advised that FLUCAS would text her or use their "code word" to get

7  PERSON 5 alone with him, using her nickname "Vader." She said "It would be like uh, Vader loves

8  Daddy, because Vader was my uh was my nickname." PERSON 5 advised that FLUCAS did not text

9  her too much, stating that "We really didn't text because you know he didn't want people to find out

10  about it through text I guess so he wouldn't be tracked I would assume."

11     109.    When PERSON 5 was in the 11th grade she wanted an Ipod. FLUCAS told PERSON 5

12  if she slept with him, he would buy her an Ipod; PERSON 5 stated, "If you sleep with me, I'll give you

13  this. Um so I got my class ring basically and my Ipod in exchange for sexual favor."

14     110.    PERSON 5 believed that FLUCAS had also been doing things to PERSON 3 and

15  MINOR 11.

16     111.    When FLUCAS moved to Oregon, PERSON 5 did not move with FLUCAS and stayed in

17  Georgia. But she related one encounter in Stockton, California, where FLUCAS tried to get PERSON 5

18  to have sex with him. PERSON 5 was in Stockton for two weeks with her mom during Christmas break

19  in 2015. PERSON 5 said, "I was sleeping downstairs on the couch and he approached me trying to

20  wake me up. I already knew what he wanted but I kind of acted like I was still asleep and I kind of

21  shrugged it off, saying leave me alone, leave me alone. Then he went back upstairs. That was the last

22  time that I encountered that."

23     112.    PERSON 5 also said there was one more incident that made her feel uncomfortable when

24  she was in Stockton visiting. PERSON 5 went into FLUCAS's master bedroom to use the shower. She

25  conveyed that FLUCAS, fully clothed, entered the bathroom while she was fully nude, and began

26  scrubbing her arms, legs, and butt. She said FLUCAS scrubbed between her legs, but never touched her

27  private part. She said she was "kind of uncomfortable in the whole situation but I didn't say anything."

28  PERSON 5 has always been afraid of her father so that is why she did not say anything to him. She

1   further stated, "I guess I've always been afraid of consequences. He would spank us regularly, you

2   know um, administer the punishment, spanking us and stuff like that. And so I kind of thought, at first I

3   didn't really want this coming out because I mean who is going to believe me? I didn't think anyone

4   would believe me at this point. Who is going to believe an 18 year old kid versus an adult? Who is

5   going to believe that their father is capable of hurting one of their siblings? Who's going to believe

6   that?" She stated, "I was afraid to speak up because I knew my Dad had provisions in place to where he

7   could get away with it." PERSON 5 advised that she would like her father to be put away because he

8   hurt her and her little sisters. She also stated she believed PERSON 3's and PERSON 4's kids were

9   fathered by FLUCAS.

10      **F.   Evidence of Flucas's Efforts to Obstruct or Impede Investigation into His Conduct**

11      113.   Based on the investigation to date, I believe FLUCAS has acted to hide or conceal his

12   conduct or to obstruct or impede anticipated and pending investigations into his conduct.

13      114.   As noted above with respect to PERSON 1's pregnancy, PERSON 1 told a Stockton

14   Police Department detective that FLUCAS told PERSON 1 what to say if people asked who the father

15   of her child was. PERSON 1 said that FLUCAS directed her to just make up a name so nobody would

16   find out. During my later interview with PERSON 1, she again stated that FLUCAS asked her to make

17   up a name of the father of her child and that she did so. PERSON 1 explained that she felt that she was

18   forced to lie maybe, and that she had to lie to protect FLUCAS. I infer from these facts that FLUCAS

19   directed PERSON 1 to conceal the true facts of her child's parentage to conceal the sexual relationship

20   between FLUCAS and PERSON 1 and to conceal FLUCAS's involvement in impregnating PERSON 1.

21      115.   Also with respect to FLUCAS and PERSON 1's pregnancy, Tony stated during an

22   interview with me that when he asked FLUCAS who impregnated PERSON 1, FLUCAS responded that

23   he was looking for the father, too. Additionally, Tony stated that he had a phone conversation with

24   PERSON 1 and FLUCAS where they discussed how PERSON 1 became pregnant. He stated that

25   FLUCAS and PERSON 1 told a story where PERSON 1 got a note to stay home from school, signed by

26   one of PERSON 1's siblings, and that she then had sex with the would-be father of her child in the

27   basement of the house. PERSON 1 told me during an interview that her father was trying to find

28   "Marcus," the boy who purportedly impregnated her. From these facts, I infer that FLUCAS

1   misdirected Tony as to the identity of the father of PERSON 1's child.

2   116.   The investigation, to date, supports that FLUCAS has directed others to make up stories

3   about the nature of their pregnancies with FLUCAS's children.

4   a)   First, on April 5, 2017, PERSON 3 admitted to Stockton Police Department Detectives

5   that, consistent with DNA reports, FLUCAS was indeed the father of her children. She further

6   admitted that FLUCAS instructed her to use the turkey basting technique as the reasoning for her

7   pregnancies, advising that her elaborate story of self-insemination was a lie and that she and

8   FLUCAS had been having sex since she was 15 years old.

9   b)   Second, as noted above, DNA testing performed by California DOJ reflects that

10   FLUCAS is the father of six children born to his step-daughter, PERSON 4. On July 31, 2017, a

11   Stockton Police Department detective interviewed PERSON 4 about the DNA results. When

12   asked why she previously lied to the detective about the father of her children—she previously

13   stated the father of five of her children was David Smith of Georgia, with whom she does not

14   have contact— PERSON 4 said that she thought it was not anyone's business. Similar to

15   PERSON 3's initial story to detectives, PERSON 4 further stated that she had injected herself

16   with FLUCAS's semen four times, resulting in her first two pregnancies. In summary, she

17   explained that when she was 16 years old, she was aware FLUCAS and her mother were having

18   sex in the bedroom. She said she would wait for FLUCAS to leave, obtain the used condom

19   from the trash, and use a syringe to inject herself with FLUCAS's semen. PERSON 4 stated that

20   she injected herself once to get pregnant the first time, and injected herself three times to get

21   pregnant again. When confronted about this story, she said she had told the truth and did not

22   know what else to tell the detectives. During the interview, PERSON 4 did admit that she and

23   FLUCAS had sex that started just prior to her nineteenth birthday, but stated that all of the sex

24   they had was consensual, that FLUCAS did not force her to have sex, and that her pregnancies

25   were not the result of sex with FLUCAS.

26   117.   As noted above, during her April 5, 2017 interview with a detective of the Stockton

27   Police Department, PERSON 3 explained what FLUCAS had done to her and stated that she did not

28   want this to get out to him. The detective verified that PERSON 3 was afraid that if she said something

1  about what happened, something bad would happen to her. When asked about her concern, PERSON 3

2  stated that her dad, FLUCAS, had said he was going to give the police the recordings of them having

3  sex, that FLCUAS told her that she would be arrested, that they would both be going down for this, and

4  that FLUCAS said that she would "do nine years."

5        118.    Based on facts of the investigation, it appears that FLUCAS took steps to avoid execution

6  of a search warrant requiring that he provide a DNA reference sample to facilitate DNA comparison

7  testing. According to Stockton Police Department reports, on February 22, 2017, a Stockton Police

8  Department detective obtained a search warrant from a judge of the San Joaquin County Superior Court,

9  authorizing the taking of a DNA reference sample from FLUCAS. That same day, the detective

10  contacted FLUCAS's retained attorney and left a message with him stating that she had obtained a

11  search warrant for a reference DNA sample from FLUCAS and wanted to set up an appointment to meet

12  with FLUCAS. On February 23, 2017, the detective again called FLUCAS's attorney, and advised him

13  about the search warrant. The attorney stated that he would call back at noon that day after he had a

14  chance to speak with FLUCAS, but never called back. Upon the detective's third call to the attorney,

15  the attorney stated that he had not had a chance to speak with FLUCAS, and requested that the search

16  warrant be faxed to his office; the detective faxed the warrant to the attorney at a fax number provided

17  by the attorney. On February 24, 2017, another detective tried to call FLUCAS's attorney, with no

18  success. On February 28, 2017, that detective attended a family court hearing where FLUCAS was

19  expected to be, but FLUCAS was absent from court; the detective made contact with FLUCAS's

20  attorney who stated he still needed to speak with FLUCAS and try to schedule a meeting for March 1,

21  2017. On March 1, 2017, the detective called FLUCAS's attorney, who did not answer the phone, and

22  left a message for the attorney to return her call. On or about March 1, 2017, another detective was

23  advised that FLUCAS had obtained a new attorney, unsuccessfully tried to make contact with the new

24  attorney, and went to FLUCAS's address in Stockton to obtain FLUCAS's DNA swab. Despite a

25  vehicle parked in the driveway, and two other vehicles parked in front of the residence, there was no

26  answer at the door. The search warrant expired. On March 8, 2017, the same detective who obtained

27  the first warrant obtained a second search warrant for FLUCAS's DNA reference sample. On March 9,

28  2017, two detectives reported to the San Joaquin County Courthouse, in Department 16. The detectives

1  met with FLUCAS's new attorney's assistant, who is described in the report as having reluctantly agreed

2  to allow the detectives to meet with FLUCAS. When FLUCAS entered the courthouse, he was escorted

3  to a private room, where the search warrant was executed.

4      119.   On or about May 2, 2017, a Stockton Police Department detective obtained a search

5  warrant for FLUCAS's residence located at 4707 Newton Falls Lane in Stockton, California. On or

6  about May 4, 2017, Stockton Police Department personnel executed the search warrant and seized

7  evidence including numerous digital devices, adult sex toys, and three digital cameras (two Vivitar

8  Vivicam 5118 cameras, and one Canon PowerShot camera).[6] During the search of the residence,

9  detectives noticed that most of the household items had been packed into moving boxes, large plastic

10  containers, and suitcases or backpacks. Stockton Police Department Detective Yanell Ysais spoke with

11  San Joaquin County CPS workers, who advised that when they visited the house on February 8, 2017,

12  these boxes were not present. One inference I draw from these facts is that FLUCAS may have intended

13  to move to avoid dealing with the new, local charges against him, similar to the move from Georgia to

14  Oregon after allegations of molesting his children were reported to Georgia authorities. On June 21,

15  2017, the Honorable Allison Claire, a U.S. Magistrate Judge with the U.S. District Court for the Eastern

16  District of California, issued a federal search warrant authorizing the search of 35 digital devices

17  originally seized by the Stockton Police Department from FLUCAS's residence. In executing the

18  federal search warrant, I noted none of the digital cameras had Secure Digital (SD) cards in them, and no

19  SD cards were seized in connection with execution of the state search warrant. I know from training and

20  experience, and my discussions with other law enforcement personnel, that SD cards are used in digital

21  cameras as memory cards to store photographs and videos.

22      120.   During execution of the state search warrant, law enforcement personnel did not locate

23  PERSON 1's cell phone, with phone number (229) 251-1830, and to date that phone has not been

24

25      [6] During the search, two firearms and ammunition were also located in the residence. A
26  Black/Gray Remington 710 Rifle .270 caliber was located in the closet of the master bedroom. A box of
   20 Winchester .270 bullets was located in the bathroom of the master bedroom. A Black/Gray Hi-Point
   CF380 handgun with a loaded magazine was located in the front living room. These items were
27  collected by the Stockton Police Department at the request of Evelyn Sagasi and were booked into the
   Stockton Police Department property room for safekeeping. These guns were not registered in the
28  National Crime Information Center (NCIC).

1   located.  During my September 20, 2017 interview with Tony, he indicated, in part, that he had

2   previously communicated with his daughter, PERSON 1, at a number with Georgia area code (229), but

3   could not recall the complete number.  He said he had not contacted her on that number since around the

4   time FLUCAS was arrested.  He recalled that PERSON 1 and FLUCAS had told Tony that PERSON 1's

5   phone had been left at a hotel between Stockton, California and Klamath Falls, Oregon, but that the

6   hotel found the phone and was going to return it to FLUCAS via mail.  During my September 22, 2017,

7   interview with PERSON 1, she also stated that her cell phone had been left at a hotel between Stockton

8   and Klamath Falls, and that FLUCAS had told her that the hotel found the phone and was going to mail

9   it; she indicated that she did not see that cell phone again.  During my September 29, 2017 interview

10  with PERSON 1, she clarified that she stayed at hotel in Klamath Falls and Medford, but she thought she

11  left her phone at the hotel in Medford, Oregon.  FLUCAS was first arrested on February 8, 2017, and

12  according to phone toll records, Tony's phone number, (707) ███-3758, had approximately 1,096

13  contacts with PERSON 1's number, (229) 251-1830, between November 23, 2015, and January 28,

14  2017, and then ceased.  However, records from AT&T show that (229) 251-1830 was still subscribed to

15  FLUCAS and was active through March 11, 2017, when AT&T records state that "Customer is cutting

16  back."  Tony's phone number then resumed contacts with PERSON 1 on a new cell phone number, with

17  area code (209), on or about February 28, 2017.  The Cerulean Hotel in Klamath Falls, Oregon provided

18  records showing that FLUCAS paid for four rooms for a stay on January 28 and 29, 2017.  On October

19  18, 2017, Devin Ross, the manager of the Cerulean, searched the hotel records and advised that there

20  was no record on the hotel's lost item log indicating that a cell phone associated with FLUCAS was

21  located, and that the hotel did not have any record of sending anything via mail from the hotel to

22  FLUCAS that was left behind.

23        121.   On July 27, 2017, Stockton Police Department Detective Yanell Ysais attended a forensic

24  interview with FLUCAS's 13-year-old son, MINOR 13.  During the interview, MINOR 13 identified his

25  father as FLUCAS and that FLUCAS called his mother Evelyn.  In part, MINOR 13 told the interviewer

26  that on the first day he was in protective custody, he had been picked up from music class by his mother.

27  While in the van with his mother, his dad called his mom and told her to not go home so nobody takes

28  the kids.  MINOR 13 said his mom drove around Walmart near their neighborhood for a while and did

1  not know what to do, so she just drove home. The interviewer asked MINOR 13 if he knew why his dad
2  said that, and MINOR 13 said "I don't know why." MINOR 13 also stated that his dad said to rent a van
3  and move somewhere else while they were still on the phone. When asked how that made him feel,
4  MINOR 13 stated that it made him feel like his dad was wanting his mom to do something she did not
5  want to do. When asked what his mom said about it, MINOR 13 said that his mom did not want
6  anything bad on her record and then went to the house.

7       122.    During surveillance of FLUCAS in and around Stockton, California on October 13, 2017,
8  FLUCAS drove in a manner consistent with counter-surveillance, making it difficult for law
9  enforcement to follow him without being detected. When exiting the highway, FLUCAS quickly
10  changed lanes from the middle lane to the right lane to take the exit, and then drove in the left exit lane
11  before changing lanes at the last minute to make a right turn. While sitting at the traffic light to turn
12  right, FLUCAS made eye contact with one of the agents conducting surveillance and held eye contact
13  for approximately five seconds. After a brief stop at a retail store, FLUCAS stopped at a traffic light
14  sitting in a right turn only lane. When the light turned green FLUCAS did not turn, but, instead,
15  accelerated straight through the light, allowing him to detect surveillance units behind him. FLUCAS
16  turned into the Orange Garden Apartments just past the intersection; had FLUCAS made the right turn,
17  there was not another entrance to the apartment complex. Because agents believed FLUCAS was
18  driving in a manner consistent with counter-surveillance, the surveillance was discontinued.

19              **IV.    CONCLUSION AND REQUEST FOR SEALING**

20       123.    Based on the foregoing, I submit that probable cause exists to believe that RODNEY
21  FLUCAS violated 18 U.S.C. § 2423(a), Transportation with intent to engage in criminal sexual activity,
22  and respectfully request that this Court issue a criminal complaint and warrant for FLUCAS's arrest.
23  I further respectfully request that this Court issue an order sealing, until further order of the Court or
24  until the arrest of RODNEY FLUCAS on the criminal complaint, all papers submitted in support of this
25  application, including the criminal complaint, arrest warrant, and this affidavit. I believe that such
26  sealing is necessary because this investigation is ongoing, and I believe FLUCAS and any confederates
27  are unaware of the federal investigation. Further, as indicted above, FLUCAS has previously attempted
28  to keep one victim from speaking through coercion and instructed other victims to create and provide

1  stories about the fathers of their children and the means of impregnation, in an apparent effort to conceal

2  his involvement in criminal conduct.  It is not clear that FLUCAS, who is presently out on bail in the

3  state matter, has ceased to contact victims to further these obstructive efforts.  Thus, premature

4  disclosure of the contents of this affidavit and related documents may have a significant and negative

5  impact on the continuing investigation and severely jeopardize its effectiveness.

6

7                                                                    Respectfully submitted,

8

9

10                                                                  Greg Wenning
                                                                    Special Agent
11                                                                  Federal Bureau of Investigation

12

13  Approved as to form:

14

15
    Nirav K. Desai
16  Assistant U.S. Attorney

17

18

19  Subscribed and sworn to before me on this _____ day of October, 2017:

20

21

22
    THE HONORABLE EDMUND F. BRENNAN
23  UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28

**ATTACHMENT D**

1  McGREGOR W. SCOTT
United States Attorney

2  NIRAV K. DESAI
JEREMY J. KELLEY

3  Assistant United States Attorneys
501 I Street, Suite 10-100

4  Sacramento, CA 95814
Telephone: (916) 554-2700

5  Facsimile: (916) 554-2900

6  Attorneys for Plaintiff
United States of America

7





8         IN THE UNITED STATES DISTRICT COURT

9         EASTERN DISTRICT OF CALIFORNIA

10

UNITED STATES OF AMERICA,      CASE NO. 2:17-CR-0209 KJM

11

            Plaintiff,    18 U.S.C. § 2423(a) – Transportation of a Minor with
Intent to Engage in Criminal Sexual Activity (two

12                 counts); 18 U.S.C. § 2421(a) – Transportation of
           v.      Individual with Intent to Engage in Criminal Sexual

13                 Activity; 18 U.S.C. § 1512(b)(2)(B) – Attempted
RODNEY FLUCAS,        Witness Tampering; 18 U.S.C. § 2428(b) – Criminal

14  aka Rodney Rochea Flucas,   Forfeiture
  aka Rodney Rochen Flucas,

15  aka Rodney J. Flucas,

16            Defendant.

17

18        T H I R D  S U P E R S E D I N G  I N D I C T M E N T

19  COUNT ONE: [18 U.S.C. § 2423(a) – Transportation of a Minor with Intent to Engage in Criminal
          Sexual Activity]

20

21     The Grand Jury charges: T H A T

22                RODNEY FLUCAS,
              aka Rodney Rochea Flucas,

23             aka Rodney Rochen Flucas,
              aka Rodney J. Flucas,

24

25  defendant herein, between on or about August 7, 2015, and on or about August 17, 2015, in the County

26  of San Joaquin, within the State and Eastern District of California, and elsewhere, did knowingly

27  transport in interstate and foreign commerce individuals, PERSON 1, PERSON 2, and PERSON 3, each

28  of whom had not attained the age of 18 years, with intent that each such individual engage in sexual

activity for which any person could be charged with a criminal offense, as specified in the table below:

| INDIVIDUAL TRANSPORTED | PROHIBITED SEXUAL ACTIVITY |
|---|---|
| PERSON 1 | (a) sexual intercourse with a person under 18 in violation of California Penal Code Section 261.5; and<br>(b) oral copulation with a person under 18 in violation of California Penal Code Section 288a |
| PERSON 2 | (a) incest in violation of California Penal Code Section 285;<br>(b) sexual intercourse with a person under 18 in violation of California Penal Code Section 261.5; and<br>(c) oral copulation with a person under 18 in violation of California Penal Code Section 288a |
| PERSON 3 | (a) incest in violation of California Penal Code Section 285;<br>(b) sexual intercourse with a person under 18 in violation of California Penal Code Section 261.5; and<br>(c) oral copulation with a person under 18 in violation of California Penal Code Section 288a |

all in violation of Title 18, United States Code, Section 2423(a).

COUNT TWO: [18 U.S.C. § 2421(a) – Transportation of Individual with Intent to Engage in Criminal Sexual Activity]

The Grand Jury further charges: T H A T

RODNEY FLUCAS,
aka Rodney Rochea Flucas,
aka Rodney Rochen Flucas,
aka Rodney J. Flucas,

defendant herein, between on or about August 7, 2015, and on or about August 17, 2015, in the County of San Joaquin, within the State and Eastern District of California, and elsewhere, did knowingly transport in interstate and foreign commerce an individual, PERSON 4, with intent that such individual engage in sexual activity for which any person could be charged with a criminal offense, to wit: incest in violation of California Penal Code Section 285, all in violation of Title 18, United States Code,

2

1  Section 2421(a).

2  COUNT THREE: [18 U.S.C. § 2423(a) – Transportation of a Minor with Intent to Engage in Criminal
3                          Sexual Activity]

4       The Grand Jury further charges: T H A T

5                          RODNEY FLUCAS,
6                      aka Rodney Rochea Flucas,
                       aka Rodney Rochen Flucas,
7                        aka Rodney J. Flucas,

8  defendant herein, between on or about June 16, 2015, and on or about August 5, 2015, in the County of

9  Modoc, within the State and Eastern District of California, and elsewhere, did knowingly transport in

10 interstate and foreign commerce individuals, PERSON 2 and PERSON 3, each of whom had not

11 attained the age of 18 years, with intent that each such individual engage in sexual activity for which any

12 person could be charged with a criminal offense, as specified in the table below:

| INDIVIDUAL TRANSPORTED | PROHIBITED SEXUAL ACTIVITY |
| --- | --- |
| PERSON 2 | (a) incest in violation of Georgia Code Section 16-6-22 |
| PERSON 3 | (a) statutory rape in violation of Georgia Code Section 16-6-3;<br>(b) child molestation in violation of Georgia Code Section 16-6-4; and<br>(c) incest in violation of Georgia Code Section 16-6-22 |

20 all in violation of Title 18, United States Code, Section 2423(a).

21 COUNT FOUR: [18 U.S.C. § 1512(b)(2)(B) – Attempted Witness Tampering]

22
23      The Grand Jury further charges: T H A T

24                         RODNEY FLUCAS,
                       aka Rodney Rochea Flucas,
25                     aka Rodney Rochen Flucas,
                         aka Rodney J. Flucas,

26 defendant herein, on or about November 2, 2017, in the Counties of Stanislaus and Sacramento, within

27 the State and Eastern District of California, did knowingly attempt to corruptly persuade another person,

28 E.S., to alter, destroy, mutilate, and conceal an object, to wit, one or more cellular phones and the

1  contents one or more cellular phones, with intent to impair the object's integrity and availability for use

2  in an official proceeding, to wit, a proceeding before a court of the United States, in violation of Title

3  18, United States Code, Section 1512(b)(2)(B).

4  FORFEITURE ALLEGATION: [18 U.S.C. § 2428(b) – Criminal Forfeiture]

5      1.      Upon conviction of one or more of the offenses alleged in Counts One through Three of

6  this Third Superseding Indictment, defendant RODNEY FLUCAS shall forfeit to the United States

7  pursuant to 18 U.S.C. § 2428(b), any property, real or personal, that was used or intended to be used to

8  commit or to facilitate the commission of such violations, and any property, real or personal,

9  constituting or derived from proceeds traceable to said violations.

10     2.      If any property subject to forfeiture as a result of the offenses alleged in Counts One

11  through Three of this Third Superseding Indictment, for which defendant is convicted:

12          a.      cannot be located upon the exercise of due diligence;

13          b.      has been transferred or sold to, or deposited with, a third party;

14          c.      has been placed beyond the jurisdiction of the Court;

15          d.      has been substantially diminished in value; or

16          e.      has been commingled with other property which cannot be divided without

17                  difficulty;

18  it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to

19  seek forfeiture of any other property of said defendant, up to the value of the property subject to

20  forfeiture.

21                                                      A TRUE BILL.

22                                          **/s/ Signature on file w/AUSA**

23

24                                          . FOREPERSON

25  MCGREGOR W. SCOTT
    United States Attorney
26

27

28

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| INFORMATION ASSOCIATED WITH | ) |
| MUSHEEDA@YAHOO.COM THAT IS STORED AT | ) |
| PREMISES CONTROLLED BY OATH HOLDINGS, INC. | ) |
| | ) |

Case No.

**2: 1 8 - SW -   5 8 9 ─── AC**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location):*

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

## SEE ATTACHMENT B, attached hereto and incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *8/1/18* _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *7/18/18 11:3 pm*

_____
*Judge's signature*

City and state:     Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

---

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
              Signature of Judge                                    Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with MUSHEEDA@YAHOO.COM that is stored at premises controlled by Oath Holdings, Inc., a company that accepts legal process at 22000 AOL Way, Dulles, Virginia 20166.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Oath Holdings, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

AFFIDAVIT

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 2421(a) and 2423(a), occurring after the creation of the email account, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence indicating to whom and when, the subscriber of the account communicated allegations of sexual, physical, and emotional abuse perpetrated by RODNEY FLUCAS;

(b) Evidence relating to RODNEY FLUCAS's intent or state of mind when transporting his family from Valdosta, Georgia, to Americus, Georgia, to Klamath Falls, Oregon, and then to Stockton, California;

(c) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner; and

(d) The identity of the person(s) who created or used the user ID.

AFFIDAVIT